**In re HUDSON OIL COMPANY, INC., Hudson Refining Company, Inc., Hudson Van Oil Company of Kansas City, Inc., Hudson Realty Company, Inc., Hudson Stations, Inc., Hudson Van Oil Co. of Florida, Inc., Hudson Oil Co. of California, Inc., Hudson Van Oil Company, Debtors.**

**Bankruptcy Nos. 84–20002 to 84–20009.**

United States Bankruptcy Court, D. Kansas.

Sept. 30, 1988.

934

Mendel Small and Scott J. Goldstein, of Spencer, Fane, Britt & Browne, Kansas City, Mo., for debtors.

Walter Kellogg, Dallas, Tex., trustee, pro se.

David Snodgrass, Neil J. O'Brien, Terri A. Hunter, Roy Morris, of Gardere & Wynne, Dallas, Tex., F. Stannard Lentz, of Lentz & Clark, Overland Park, Kan., for trustee.

David R. House, Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Janice Miller Karlin, Asst. U.S. Atty., D.Kan., Kansas City, Kan., for I.R.S.

Thomas M. Mullinix and Joanne Stutz, of Evans & Mullinix, Kansas City, Kan., for Creditors Comm.

Carol Park Wood and William Wooley, U.S. Trustee's Office, Wichita, Kan.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This matter came for hearing on November 4 & 5, 1987, upon the trustee's second amended motion to resolve the debtors' federal tax, interest, and penalty for the taxable year ending October 31, 1983. The trustee, Walter Kellogg, appeared in person and by and through counsel, Neil J. O'Brien, Terri A. Hunter, and Roy Morris, of Gardere & Wynne, Dallas, Texas. The Internal Revenue Service appeared by and through counsel, David R. House, Trial Attorney, Tax Division for the United States Department of Justice, and Janice Miller Karlin, Assistant United States Attorney for the District of Kansas. The creditors committee appeared by and through its counsel, Thomas Mullinix and Joanne Stutz of Evans & Mullinix, Kansas City, Kansas. The United States Trustee's Office appeared by and through counsel, William Wooley.

## FINDINGS OF FACT

Based upon the stipulations, the testimony of witnesses, the exhibits, pleadings, and the record filed herein, the Court finds as follows:

1. Hudson Oil Company, Inc. (hereinafter referred to as "Hudson") is a Kansas corporation with its principal place of business located at 4720 Rainbow, Shawnee Mission, Kansas. Hudson's employer identification number is 480533763. Hudson Refining Co., Inc. is a Delaware corporation with its principal place of business located at 4720 Rainbow, Shawnee Mission, Kansas. Hudson Refining's employer identification number is 731004411. Hudson Refining is an 80% or more controlled subsidiary of Hudson. Hudson and Hudson Refining filed a consolidated federal income tax return on June 9, 1986, utilizing the accrual method of accounting for the taxable year ending October 31, 1983.

2. On January 3, 1984, debtor filed a petition in this Court for protection under Chapter 11 of Title 11, United States Code. The debtor's tax return for the 1983 tax year was due on January 15, 1984. On January 13, 1984, the debtor-in-possession filed an Application for Automatic Extension of Time to File Corporation Income Tax Return, Form 7004.

3. On March 6, 1984, Walter Kellogg was appointed as trustee to administer debtor's estate. At the time of his appointment, the trustee was unaware of the filing of the Application for Automatic Extension.

4. On March 9, 1984, the trustee selected Dan B. Lain, P.C. (later becoming Lain, Faulkner & Company) as his operations and financial manager. The trustee delegated to Lain the responsibility of filing the federal income tax returns and directed Lain to examine the books and records as soon as possible. Lain became aware of the application for extension of time to file the 1983 return sometime after March 19, 1984. The debtors received a letter from the IRS dated March 19, 1984, stating that extension would expire on March 29, 1984, unless the debtors immediately paid their estimated tax liability. Lain responded to

the IRS that no payments could be made toward the tax liability shown on the extension because the tax due was a pre-petition debt subject to the automatic stay.

5. Lain then retained James Yarmchuk, P.C. to prepare and file the debtors' 1983 tax return. Yarmchuk was a highly qualified and competent tax accountant, who both the trustee and Lain had used on several prior occasions. At the time he was retained, Yarmchuk believed that the 1983 return was already past due. Both Lain and Yarmchuk testified that they found that the books and records were in somewhat disarray as a result of the companies' filing of bankruptcy.

6. By April or May of 1984, Yarmchuk testified that he made a preliminary conclusion that there would be no taxable 1983 income for the debtors. Furthermore, Yarmchuk testified that he wanted to file a complete and accurate return, but because of the condition of the books and the shortcomings of the accounting system, he was concerned about the integrity of the numbers. In order to file a complete and accurate return, Yarmchuk testified that he wanted to wait at least until Price Waterhouse & Company completed its audit report of the companies' financial statement for the period January 1, 1983 to January 3, 1984, and the Department of Labor (DOL) completed its calculations. Yarmchuk advised the trustee of his concerns about the integrity of the numbers and the absence of the DOL calculations. The trustee testified that he relied on Yarmchuk's advice and judgment concerning the timing of the filing of the return; and decided not to file the return until receipt of the audit from Price Waterhouse & Co. and the completed calculations from DOL. Price Waterhouse & Co. had been in the midst of its audit of the debtors' 1983 tax year when debtors filed for reorganization, at which time Price Waterhouse ceased its audit of debtors. In April of 1984, the trustee authorized Price Waterhouse to complete the audit, which Price Waterhouse did for the period January 1, 1983 through January 3, 1984, the filing date of the petition. Price Waterhouse delivered its audit to debtors in October of 1984.

7. In addition to waiting for the Price Waterhouse audit, Yarmchuk testified that he also wanted to wait for the calculation of damages in a lawsuit between the Department of Labor (the "DOL") and Hudson. The DOL instituted suit against Hudson in 1977 asserting violations of the minimum wage, overtime and recordkeeping provisions of the Fair Labor Standards Act of 1938.

8. The DOL case was tried over a two-week period, from July 26, 1982 through August 2, 1982.

9. An order was entered October 14, 1983, by the Honorable Earl E. O'Connor entitled "Memorandum and Order." The order set forth findings of fact and conclusions of law wherein the court found that Hudson's actions were not in good faith nor based on reasonable grounds, but rather that the debtor had knowingly, willfully, and blatantly violated the Fair Labor Standards Act of 1938. The order further set forth a formula for calculation of damages by the DOL. In addition, the order awarded post-judgment interest on the damages at the rate of 10% per annum and awarded costs to the DOL.

10. The initial calculations were completed in November, 1984 but due to errors in calculations it was necessary to recalculate the figures which resulted in the completion date being extended to June, 1985.

11. The DOL calculated that the full amount of the liability was $12,842,472, of which $8,937,165 was Hudson's proportionate share. Sometime after June 1985 and before June 1986, the DOL and the trustee entered into a settlement agreement for payment by debtor of $5,500,000, of which $3,460,517 was Hudson's proportionate share. The settlement agreement is subject to approval by this Court.

12. At a meeting of creditors on August 1, 1984, Lain reported to the creditors, including IRS' counsel, Jan Karlin, on the status of the preparation of the 1983 return. Lain also informed the IRS that the filing of the return would be delayed because of the lack of progress in completing the DOL calculations. At subsequent cred-

itors' meetings, Lain updated creditors on the progress of preparation of the 1983 return. Lain reported that there would be no tax liability because of the DOL litigation. Lain also reported that he felt there would be a reasonable position for taking a deduction for the Department of Energy ("DOE") litigation. Lain and Karlin had discussions concerning the filing of the returns. By letter dated June 21, 1985, Karlin informed Lain that he should file any federal tax return in Wichita, Kansas. By subsequent letter dated June 25, 1985, Karlin stated that the returns should now be filed in St. Louis, Missouri instead of Wichita. This Court set the last date for filing proof of claims in the chapter 11 proceeding at January 4, 1985. On January 4, 1985, the IRS filed a proof of claim estimating federal income tax for the 1983 tax year at $1,028,902. The IRS' proof of claim did not provide for any type of penalty, late-filing or otherwise.

13. Yarmchuk completed the return on June 9, 1986. The return reflected a net loss for the 1983 tax year of $5,933,201. Among the items reflected on the return, the debtor claimed the following adjustments to income:

 a. contained within salaries expense was the amount of $3,460,517 which represented the settlement amount reached with the DOL during June of 1985 through June of 1986. This portion of the salaries expense was not separated out on the return, nor was it disclosed on the return that this portion was attributable to the DOL settlement. Yarmchuk testified that he thought the damages in the DOL lawsuit were deductible in the 1983 tax year because the order entered on October 14, 1983 in that litigation met the all events test, which governs the timing of deductions for contested liabilities, and that the deduction had to be taken in the 1983 return or it would otherwise be lost; and

 b. contained within cost of sales and interest expense was the amount of $7,388,360 for violations asserted by the Department of Energy (DOE)

against debtor. This portion of the cost of sales and interest expense was not separated out on the return, nor was it disclosed on the return that this portion was attributable to the DOE settlements.

14. The DOE deduction arose out of the following scenario. On May 1, 1981, the DOE issued a Notice of Probable Violation ("NOPV") to Hudson Refining alleging Hudson Refining violated DOE regulations by charging excessive prices for gasoline. The DOE amended the NOPV twice through Proposed Remedial Orders ("PROs"). In its most recent PRO, filed March 17, 1983, the DOE alleged Hudson Refining violated DOE regulations and avoided its obligation under the Entitlements Program as a result of Hudson Refining's treatment in its Refinery's Monthly Reports of certain purchases and sales of crude oil during August 1980 through December 1980.

15. President Richard Nixon imposed economy wide price controls on August 15, 1971. By the Spring of 1974, coincident with the first Arab oil embargo, price controls remained only on the energy industry.

16. Beginning with the Emergency Petroleum Allocation Act in 1973, virtually all enabling legislation required protection for "small refiners," a category that included the debtor's refinery.

17. The two principal programs that the responsible agency promulgated to relieve the burden of price controls from small refiners were the "Buy/Sell" Program and the "Entitlements" Program. The Buy/Sell Program required refiners with access to imported crude oil to sell oil to small refiners, including debtor, which were without such access.

18. The Entitlements Program recognized that, with different maximum legal prices set for the same quality of crude oil, some refiners might have an unfair cost advantage over others. Thus, the program required refiners who had a greater supply of low priced crude than the national average to buy "entitlements" from refiners with high priced sources. Superimposed on

this was a "small refiner bias," which granted small refiners additional entitlements regardless of their crude costs. The Entitlements Program recognized different maximum legal prices in effect during that period of time for the same quality of crude oil, would result in some refiners having unfair cost advantages over others. The program required refiners who had a greater supply of low priced crude than the national average to buy "entitlements" from refiners with high priced sources.

19. In its PRO, the DOE alleged Hudson Refining had failed to report purchases of 60,336 barrels of controlled crude oil and found Hudson Refining had avoided its obligation under the Entitlements Program in the amount of $1,186,597, plus interest.

20. Hudson Refining filed a Statement of Objections to the PRO, on May 23, 1983.

21. Of the 60,336 barrels Hudson Refining allegedly failed to report, Hudson Refining admitted, in the Statement of Objection, failing to report 49,176 barrels for which Hudson Refining was obligated in the amount of $942,556, plus interest for the period August 1980 to December 1980. Hudson argued in the alternative that the entire PRO was in error for failure to set forth a prima facie case.

22. On July 27, 1983, Hudson filed a reply to the DOE's response. In the reply, Hudson argued the entire proceeding must be dismissed due to a recent U.S. Supreme Court decision which rendered the DOE regulations unconstitutional. On July 1, 1985, the Office of Hearings and Appeals issued its decision and affirmed with the modifications of the PRO.

23. As stated earlier, Yarmchuk included a deduction on the 1983 return of $7,388,360 for the DOE litigation. Of the $7,388,360 deduction, $1,388,360 reflected a liability of $942,556, plus accrued interest of $462,568, admitted by Hudson in the case. The interest was understated by $16,764, bringing to a total of $1,405,124, the admitted liability and accrued interest. As for the remaining $6,000,000, Yarmchuk testified that he understood from company personnel that Washington legal counsel representing Hudson Refining had admitted liability on other issues involving at least this amount, and that counsel had offered to settle the DOE litigation for a total of $7,400,000.

24. Yarmchuk testified that he also included a deduction for various breach of contract actions filed against it in the amount of $970,000 based on information from the Price Waterhouse financial report. The financial statement listed the liabilities as contingent, contested, and uncertain in amount. A final order had not been entered in these actions as of October 31, 1983. Furthermore, Yarmchuk testified that he included a deduction for loss of crude oil entitlements because the debtors had accrued that amount on their books as a receivable which was considered uncollectible. However, in proposing the deduction, Yarmchuk was never advised that the crude oil entitlements had never been taken into income by the debtors.

25. After Yarmchuk completed the return in June of 1986, he presented it to Lain, who signed it and filed the return with the IRS on June 9, 1986.

26. On the same date the return was filed, June 9, 1986, the trustee requested a prompt audit of the debtors' 1983 tax liability pursuant to 11 U.S.C. § 505(b). Revenue Agent Joseph Dillingham began auditing the return in June of 1986. When he first arrived at the debtors' office, he was shown the return, Yarmchuk's adjustments to the return, the companies' general ledger, and documentation supporting the deductions. The debtors' personnel fully cooperated with Dillingham. During the audit, Dillingham discussed with the debtors' personnel and the trustee the reasons for the late filing and the deductions.

27. On February 6, 1987, the IRS issued a letter (the "90–day letter") asserting that the debtors improperly deducted four items on their 1983 return, and that the debtors failed to include imputed income of $70,794 and $104,358 in the taxable years October 31, 1982 (the "1982 tax year") and the 1983 tax year, respectively. The four deductions disallowed by the IRS included a deduction for a salaries expense of $3,460,517 arising out of the Department of Labor

litigation, a deduction for a breach of contract liability in the amount of $970,000, a deduction for cost of sales and interest expense of $7,388,360 arising out of assertions of liability by the Department of Energy, and a deduction for lost entitlements of $566,225. As a result of the IRS' proposed disallowance of the four deductions and its assertion of the two imputed interest income items, later conceded by the IRS, the IRS determined debtors had a tax due for the 1983 tax year. The IRS eliminated the asserted tax liability by applying net operating loss carrybacks from the taxable years ended October 31, 1984 and 1985 (the "1984 and 1985 tax years", respectively), thus reducing to zero the taxable income for 1983. Although the IRS acknowledges there is no tax due for the 1983 tax year, the IRS nevertheless asserts four penalties, calculated on the alleged tax the IRS determined to be owing for 1983 before application of carrybacks. The IRS asserted four penalties in the 90–day letter: (1) a late-filing penalty, pursuant to § 6651(a)(1) of the Internal Revenue Code of 1954 ("IRC"); (2) a negligent underpayment penalty, pursuant to IRC § 6653(a)(1)(A); (3) a negligent underpayment penalty calculated as a percentage of the interest due under IRC § 6601 and dependent upon the imposition of the first negligent underpayment penalty, pursuant to IRC § 6653(a)(1)(B); and (4) a substantial understatement penalty, pursuant to IRC § 6661(a)(b)(1). The IRS asserted the late filing penalty because the trustee filed the 1983 return after the due date of the 1983 return. The IRS asserted the negligent underpayment penalties because, in the IRS' opinion, the deficiency (the difference between the tax determined by the IRS and the zero tax reflected on the debtors' 1983 return) was due to the debtors' negligence or disregard of rules in preparing their 1983 return. The IRS asserted the substantial understatement penalty because the deficiency, as calculated by the IRS, exceeded 10% of the zero tax due reflected on the debtors' 1983 return.

28. The net effect of the IRS adjustments to income was to increase taxable income to $6,480,876, before the allowance of the net operating loss carrybacks for the taxable years ending October 31, 1984, and October 31, 1985. The tax liability on the $6,480,876 was $2,752,489. After crediting investment credit carry-over of $572,963, the 1983 tax year investment credit of $126,733, and an alcohol fuel credit of $72,-462, the IRS found the resulting income tax liability to be $1,980,331. The IRS computed penalties based on the tax liability of $1,980,331.

29. Dillingham testified that the normal procedure in an audit is for IRS to first send out a 30–day letter advising the taxpayer of an opportunity for an appeals conference, and, if the matter is not settled, the IRS then sends out a 90–day letter. However, Dillingham testified that due to the deadline set by the debtors' request for early determination, the normal procedure in first sending a 30–day letter would have been difficult to follow.

30. On September 16, 1987, the United States filed an amended proof of claim providing that the income tax liabilities for 1983 had been reduced to zero and listing the penalties in the total amount of $1,097,-064.66.

31. Before assessing the penalties, the IRS did not take into account the fact that the debtors were entitled to a prior refund. Back on January 14, 1983, the IRS determined that the debtors were entitled to a refund of $895,601 for the taxable year 1980. More than a year ago, the Joint Committee on Taxation advised the IRS that it had no objection to the refund. Since then, the IRS has withheld the refund pending determination of the debtors' tax liability for the 1983 tax year. The IRS has asserted it will petition the Court to lift stay to offset the refund against any liability of the debtors for the 1983 tax year.

32. Before assessing the penalties, the IRS also did not offset a $49,156 refundable alcohol fuel credit claimed on the 1983 return against the 1983 tax liability. The parties stipulate that the 1983 return, as filed, properly showed a refundable fuel credit in the amount of $49,156.

33. On April 16, 1987, the debtors filed a motion to resolve federal 1983 tax liability pursuant to § 505 of the Code. The debtors filed the motion (1) in objection to the IRS proof of claim, (2) in opposition to the penalties asserted in the 90–day letter, and (3) for the $895,601 refund for 1980. On June 11, 1987, the debtor filed an amended motion to resolve federal 1983 tax liability asserting over $7,000,000 of additional adjustments to reduce the debtors' net taxable income, thereby reducing the penalties. On October 28, 1987, the debtors filed a second amended motion to resolve federal 1983 tax liability. The motion asserted the following additional adjustments to income:

a. Write-off in the tax year by debtor of gasoline inventory for gasoline stations closed during year ended October 31, 1983 of $33,336;

b. Write-off in the tax year by debtor of merchandise inventory of gasoline stations closed during year ended October 31, 1983 of $185,613;

c. Write-off in the tax year by debtor of abandoned equipment for gasoline stations closed during the 1983 tax year of $85,892;

d. Addition in the tax year by debtor to workmen's compensation expense of $24,081;

e. Wire transfer in the tax year by debtor not recorded properly of $77,464;

f. Interest expense incurred by Hudson Refinery Co., Inc. of $16,764, on admitted liability to DOE;

g. Understatement of costs of goods sold by Hudson Refinery Co. of $46,510;

h. Write-off by Hudson Refinery Co., Inc. of chemical inventory of $123,983;

i. Additional health plan expense of $10,000;

j. Write-off as a deduction of all or part of the $7,498,957 tax basis of the Cushing Refinery because the refinery was permanently retired from use in debtor's business during the 1983 tax year, or, as of that date, had no remaining useful life as a refinery in

debtor's business as a result of obsolescence.

k. Deduction by debtor of additional state income taxes due for the 1983 tax year of $47,500.

34. The parties entered into the following stipulations of fact just prior to trial to resolve several issues:

a. Debtors did not have imputed interest income of $70,794 and $104,538 in the 1982 and 1983 tax years, as asserted by the IRS in its 90–day letter;

b. Debtors may deduct from their taxable income, if any, in the 1983 tax year the following items:

(1) $14,059 for obsolete or abandoned gasoline inventory;

(2) $33,193 for obsolete or abandoned merchandise inventory;

(3) $77,464 for a gasoline purchase expense;

(4) $24,081 for workmen's compensation expense;

(5) $10,000 for health plan expense; and

(6) $47,500 for state income taxes.

35. In addition, in order to complete the trial without further postponement, the trustee chose not to put on evidence of the following deductions claimed in the Second Amended Motion to Resolve Debtors' Federal Tax Liability and therefore concedes three issues: (1) $19,277 of gasoline inventory; (2) $152,420 of merchandise inventory; and (3) $46,510 of supplies inventory.

36. This matter came for hearing on November 4 & 5, 1987, upon the trustee's second amended motion to resolve the debtors' federal tax, interest, and penalty for the taxable year ending October 31, 1983. Much of the hearing centered around the debtors' deduction of all or part of the $7,498,957 tax basis of the Cushing Refinery. The trustee contended that the refinery was permanently retired from use in the debtors' business during the 1983 tax year, or, as of that date, had no remaining useful life as a refinery in the debtors' business as a result of obsolescence.

37. On February 1, 1977, Hudson Refining purchased the refinery at Cushing, Oklahoma (the "refinery") for approximately $12,000,000. The refinery had a capacity of 19,500 barrels per day. It had a catalytic cracker, an alkyl unit, and a coker. The refinery processed petroleum crude oil and made refined product gasoline, distillates, or diesel, heating oil, propane, and coke. The refinery was equipped to refine "sweet crude," meaning a crude with a low sulphur content, as opposed to a "sour crude." The refinery was the principal asset of the subsidiary, Hudson Refining Co. Inc.

38. The refinery operated profitably through October 31, 1980, due largely to the receipt of income from the Entitlements Program. The refinery received $65,927,979 from the Entitlements Program from November of 1977 through January of 1981. For each of those years, the refinery posted a profit. After President Reagan's abolition of price controls and the Entitlements program on January 27, 1981, the refinery operated at losses in calendar years 1981 and 1982 of $10,729,069 and $13,293,876, respectively. During this time period, other oil companies were shutting down many refineries for lack of positive cash flow. During 1982, 30 to 40 refineries closed. By 1983, approximately 60 refineries had closed. By 1985, a total of 150 refineries had closed. Aside from the cutoff of entitlements, other factors were severely depressing the oil and gas refining industry during the early 1980's. Car manufacturers produced small cars that required less fuel. The demand for leaded gasoline reduced dramatically. Car manufacturers provided autos with catalytic converters which are highly sensitive to leaded gasoline. The Environmental Protection Agency was moving toward allowing the production of only lead-free gasoline, again forecasting the obsolescence of leaded gasoline [The Cushing Refinery produced mostly leaded gasoline].

39. In January of 1982, Hudson shut down their refinery in order to accomplish a turnaround. A "turnaround" is done every 2 to 2½ years in order to make necessary maintenance and repairs. In May of 1982, Hudson restarted and ran the refinery through November of 1982.

40. In October of 1982, the First National Bank of Oklahoma, the agent and lead bank in Hudson's bank credit lines, advised Hudson that it was canceling the refinery's letter of credit. Hudson shut down the refinery in December of 1982, within the 1983 tax year. At the time Hudson shut down the refinery in December of 1982, both Forest Fugua, plant manager of the refinery, and Thomas Raimo, president of Hudson, thought it would eventually reopen. After the shutdown, Hudson took steps to protect the refinery equipment.

41. Raimo testified, however, that by the end of the 1983 tax year, he considered that the refinery was closed permanently for the following reasons: (a) officers of Hudson were unable to obtain alternate financing for the refinery; (b) the loss of entitlement income; (c) the declining market for gasoline products, specifically leaded gasoline; (d) the refinery's inability to produce lead-free gasoline without significant capital expenditures; (e) the necessity for significant capital expenditures to just restart the refinery; and (f) emerging environmental problems. Other Hudson personnel including Fugua and Dan McClean, vice-president of Hudson, testified in support of Raimo's conclusion that the refinery was probably permanently shut down. However, Raimo never told Fugua that the shut-down was permanent.

42. Throughout the course of the 1983 tax year, Hudson Refining began terminating most of the refinery's employees. However, Hudson never advised the union workers that the shut-down was permanent or that severance pay would be forthcoming as of October 31, 1983.

43. Martin Sallay, of Price Waterhouse, testified that the refinery had not been written off on Hudson's books at the time of his audit in 1984. In fact, working papers prepared by Sallay contain a reference to a conversation Sallay had with Raimo concerning severance pay for the workers. Sallay noted that the severance liability had never been recorded "because it was ex-

pected that the refinery would reopen, employees would be rehired, and no severance pay would be paid. Mr. Raimo stated that as a result of the bankruptcy it appears that the refinery will not open and as a result the company will have a severance pay liability." In the audit report issued by Price Waterhouse for the period from December 31, 1982 to January 4, 1984, there is no mention that the main asset of Hudson Refining Company, the refinery, was retired, abandoned, or obsolete. Further, the debtor still carries the refinery on its books in a fixed asset account and takes depreciation on it.

44. Revenue Agent Dillingham testified that he reviewed Hudson's books and records during his audit of the 1983 return. During that examination, he found no indication that the refinery was either abandoned, retired, or considered obsolete in 1983.

45. The debtor did not take a deduction for the refinery on the original 1983 tax return. In fact, the first mention, in writing, of a retirement, abandonment, or obsolescence was in the debtors' first amended motion to resolve federal 1983 tax liability filed in June of 1987.

46. The Cushing Refinery used a platinum catalyst. This type of catalyst can be removed and sent to a plant in order to reclaim the platinum. The record presents conflicting testimony concerning the time frame in which Hudson removed the catalyst from operation. Although he could not know first hand since he was not appointed until March of 1984, the trustee testified that he thought Hudson removed the catalyst in October of 1983, during the 1983 tax year. However, Fugua, the plant manager whose office is actually located at the refinery, testified that Hudson did not remove the catalyst until October of 1984 or 1985, clearly outside the 1983 tax year.

47. After the banks cut off Hudson Refinery's letter of credit, Hudson was unable to obtain further financing to purchase crude oil and operate the refinery. In the summer of 1983, Hudson attempted to sell the refinery and soon entered into negotiations with one prospective buyer for an option to purchase the refinery. After the bankruptcy, the trustee also attempted to sell the refinery. After a shutdown of over five years, the trustee is currently attempting to sell the refinery for approximately $4,000,000.

48. The parties stipulate that, at the close of the 1983 tax year, the Cushing Refinery had an unrecovered tax basis of $7,498,957.

49. Both the debtors and the government produced expert testimony as to the value of the refinery at the end of the 1983 tax year. Ben L. Malek of P.C.I. Consultants, Inc. testified on behalf of the debtors. PCI is a firm of professional engineers headquartered in Houston, Texas. The firm has over 20 years of experience in serving the refinery, gas processing, petrochemical, insurance, and banking industries. Their work has encompassed management consulting, design, construction project management, and the market appraisal of industrial properties, including numerous small to intermediate U.S. refineries. PCI was retained by Hudson Refining to prepare a "market" value appraisal of the Cushing Refinery for the fourth quarter of 1983. To arrive at the market value, PCI relied heavily on information supplied by Hudson during an on-site visit on June 18, 1987, and on file information from previous work performed for Hudson. Apparently, PCI had done an appraisal of the "replacement" value of the refinery back in 1984 for the trustee (*See Government Exhibit S—1984 PCI Appraisal*). Malek testified that he thought that the trustee would use the 1984 appraisal in attempting to sell the refinery back in 1984.

50. Malek of PCI testified that the fair market value of the refinery as of October 31, 1983 was merely salvage value of $462,000. Malek prepared a detailed report that the refinery could not operate profitably, and therefore, a "willing buyer" would not pay more than salvage for the refinery (*See Debtors' Exhibit 11—1987 PCI Appraisal*).

51. Certainly Malek's 1987 appraisal of $462,000 is somewhat suspect in light of his

prior 1984 appraisal of "as is" replacement value of over $12,000,000. Furthermore, in the new 1987 appraisal, Malek took into account $1,600,000 of environmental costs and that certain equipment was missing. The 1984 appraisal found that any environmental costs would be minimal and that all the equipment was present and in good condition. Certainly the 1984 appraisal is more accurate as to the condition of the refinery in 1983 than the 1987 appraisal just because it is so much nearer in time.

52. Malcolm Turner of Turner, Mason & Company, testified on behalf of the government. Turner did not prepare an appraisal. Rather, he presented a model of operations by a fictitious entity utilizing known raw materials, product prices, and projecting costs within the industry's norms. The report indicated that the refinery could have been generating a positive cash flow for the period from 1982 through 1986. Turner testified that it was his opinion that the fair market value of the refinery was in excess of $7,500,000.

53. On cross-examination, he admitted that the report did not include a complete set of numbers. Furthermore, he attempted to demonstrate how the model worked on the stand, with very little success.

54. Aside from the refinery issue, the hearing also addressed the deductibility of $85,892 worth of "wing signs." In 1981, Hudson had purchased wing signs for use in advertising at its 315 gasoline stations. During the fiscal year 1983, Hudson began closing stations. As of October 31, 1983, Hudson only had 90 to 98 stations open and had not used $85,892 worth of these signs. A special paint used to paint Hudson's logo on these signs rendered the signs useless to anyone other than Hudson. In review of Hudson's books and records, Revenue Agent Dillingham discovered that Hudson had not written off the wing signs on the books until March 29, 1984.

## CONCLUSIONS OF LAW

It has been opinionized by some that the Internal Revenue Code is one of the most complicated documents ever written. From my experience, the same can be said about the Bankruptcy Code. Thus, if you can just visualize how complex matters become whenever the two Codes become intertwined, you can imagine this case; the case to determine Hudson Oil's tax, interest, and penalty liability for the tax year ending on October 31, 1983. The debtors' or trustee's [this Court will use these terms interchangeably throughout this opinion] numerous contentions are stated in the alternative and as a result breed issues within issues. As such, the Court deems it necessary to recount an overall outline of these contentions to aid in fully understanding how all the issues arise.

The debtors raise the following four contentions as a complete bar to any tax, interest, or penalty liability: (1) that the IRS failed to timely notify the trustee of the alleged penalties; (2) that the trustee did not have a duty to file the 1983 return; (3) that the trustee acted reasonably with respect to the preparation and filing of the 1983 return; and (4) that Hudson permanently retired the refinery in 1983 giving rise to a deduction of at least $6,200,000.

The debtor/trustee further alleges that if this Court finds for the IRS and against the debtors on all four contentions listed above, or finds that the refinery was permanently retired, but allows a deduction of less than $6,200,000; then in that event, the debtors raise the following additional contentions: (1) that the IRS' amended proof of claim is invalid with respect to the late-filing penalty; (2) that the IRS' claim for a negligent underpayment penalty pursuant to § 6653(c)(1)(B) is invalid because the underlying interest upon which the penalty is based does not accrue; (3) that the IRS must offset the 1980 overpayment of $895,601, plus accrued interest and the 1983 refund claim against the 1983 tax liability before computing penalties; (4) that the IRS did not meet their burden of proof; (5) that the debtors can deduct the DOL liability; (6) that the debtors can deduct the DOE liability; and (7) that the debtors can deduct the $85,892 of wing signs.

## A. JURISDICTION

This Court has jurisdiction to "determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." *See* 11 U.S.C. § 505(a)(1). In addition, this Court has jurisdiction over this motion and these parties pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and 26 U.S.C. § 6871. Venue is proper in this district.

## B. BURDEN OF PROOF

Outside bankruptcy, the burden of proof with respect to a claimed deduction is normally on the taxpayer. *See New Colonial Ice Co., Inc. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); and *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933).

■ However, in the bankruptcy context, questions of burden of proof on claims or objections to claims, including tax claims, are governed by the Bankruptcy Code and Rules. A creditor's (IRS) proper filing of a proof of claim constitutes prima facie evidence of the validity and amount of the claim pursuant to section 502(a) and Rule 3001(f). Upon filing of an objection, the trustee is then called to produce evidence and show facts tending to defeat the claim. If the trustee succeeds in overcoming the prima facie effect of the proof of claim, then the burden remains on the creditor to prove the validity of the claim. *See In the Matter of Seafarer Fiber Glass Yachts, Inc.,* 475 F.Supp. 1097 (E.D.N.Y. 1979); *In re Watson,* 456 F.Supp. 432, 435 (S.D.Ga.1978); *In re Avien, Inc.,* 390 F.Supp. 1335 (E.D.N.Y.1975), *aff'd,* 532 F.2d 273 (2d Cir.1976); *In re Koontz Aviation, Inc.,* 71 B.R. 608 (Bankr.D.Kan.1987); and 3 Collier on Bankruptcy ¶ 502.01[3] (15th ed. 1988).

## C. TIMELINESS OF IRS' NOTIFICATION OF PENALTIES

■ Pursuant to section 505(b), the trustee requested that IRS determine the 1983 tax year liability. The request was made simultaneously with the filing of the return on June 9, 1986. Section 505(b)(1)(B) states that after such a request, the trustee, the debtor, and any successor to the debtor, are discharged from any liability if the "governmental unit does not complete an examination and notify the trustee of any tax due, within 180 days after such request or within such additional time as the court, for cause, permits." On December 30, 1986, this Court issued the following agreed order granting additional time of 60 days:

Now on this 30 day of December, 1986, comes on for hearing the motion of the United States for an extension of time to comply with 11 U.S.C. § 505(b)(1)(B) to the extent said statute is applicable to the facts of this case. The Court, being advised that the debtor in possession has no objection to the Internal Revenue Service (IRS) being granted an additional 60 days to complete its examination in this matter finds, without deciding whether or not under the facts of this case the IRS was required to complete the examination and notify the trustee of a tax due within 180 days after the request of the trustee, that the IRS shall be given a 60-day extension of time to complete its examination of the debtor's 1983 tax return.

The IRS did not respond until February 6, 1987, 242 days after the trustee's request on June 9, 1986. The trustee now argues that neither he, the debtors, nor any successor of the debtors can be held liable for the penalties because the IRS failed to notify the trustee of the penalties within the time prescribed by law.

The Court finds this argument is without merit for two reasons. First, the aforementioned agreed order is vague at best. It is hard to determine from reading the order when the 60-day period begins. Does the extension begin from the end of the 180 days as the trustee argues or does it begin from the date of the order, December 30, 1986? Second and in any event, this Court is not about to bar the IRS' very substantial claim just because the notice

may be two days late. Such a result would be highly inequitable and possibly amount to an abuse of discretion. This Court finds that the IRS substantially complied with the time requirements prescribed by section 505(b)(1)(B).

### D. TRUSTEE'S DUTY TO FILE THE 1983 RETURN

The trustee contends that, under 26 U.S.C. § 6012(b)(3) (Internal Revenue Code), he had no obligation or duty to file the 1983 return because he did not have possession of or hold title to substantially all the property or business of the debtors at any time during the 1983 tax year. The trustee contends that his only obligation with respect to the 1983 return was to first furnish "information" to IRS under 11 U.S.C. § 1106(a)(6), without personal liability, which he did. As such, the trustee contends that neither he nor the debtors are liable for any of the penalties.

However, this Court is not persuaded by this argument of the trustee. First of all, the argument misconstrues both 26 U.S.C. § 6012(b)(3) and 11 U.S.C. § 1106(a)(6). Second, the argument is irrelevant and illogical since we are addressing the *debtors'* liability, not the trustee's individual liability.

■ Section 6012(b)(3) of the Internal Revenue Code governs the duty of trustees of bankrupt corporations to file tax returns and provides:

> **(3) Receivers, trustees and assignees for corporations.**—In a case where a receiver, trustee in a case under title 11 of the United States Code, or assignee, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, whether or not such property or business is being operated, such receiver, trustee, or assignee shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.

Nowhere in this section does it state that a trustee's duty to file return is limited to those years when he *held* possession or title to all or substantially all the property or business during the actual tax year. On the contrary, the section clearly provides that if the trustee *has* property or business of the corporation now he shall file the return in the same manner as corporations are required. As such, if the trustee *has* all or substantially all the property of the business of a corporation and the tax return is due, the trustee should file the return even though the taxable year may have ended prior to the filing of the petition. *See Otte v. United States,* 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974); and *Nicholas v. United States,* 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966).

■ In addition, section 1106(a)(6) of the Bankruptcy Code does not bar the imposition of penalties against the debtors. Section 1106(a)(6) provides that a trustee shall—

> (6) for any year for which the debtor has not filed a tax return required by law, furnish, without personal liability, such information as may be required by the governmental unit with which such tax return was to be filed, in light of the condition of the debtor's books and records and the availability of such information; and

Section 1106(a)(6) merely concerns the trustee's *personal* liability for information provided to the Internal Revenue Service. The trustee's personal liability is not at issue in this case. Rather, this Court is concerned with the debtors' liability for the penalties. Section 1106(a)(6) does not in any way limit the debtors' liability.

### E. CIVIL PENALTY FOR THE LATE FILING OF THE RETURN—§ 6651

The trustee presents two separate arguments pertaining to the IRS' assessments of the late-filing penalty under § 6651 of the Internal Revenue Code. First, the trustee contends that the IRS' amended proof of claim as it solely pertains to the late-filing penalty is itself out of time (after the court-ordered claims bar date). Second, the trustee presents a "reasonable cause" defense to the late-filing of the return.

### 1. *Timeliness of IRS' Amended Proof of Claim*

 This Court set January 4, 1985, as the last day for filing proofs of claims. The IRS originally filed a proof of claim on January 4, 1985, reflecting an "estimated" income tax liability of $1,028,902. After the trustee finally completed the 1986 return in 1986 and the IRS completed their audit of the return, the IRS filed an amended proof of claim on September 16, 1987. The amended proof of claim reflected no 1983 income tax liability because of the application of the net operating losses from later years. However, the claim asserted the various penalties including the late-filing penalty.

The trustee objects to the purported amended proof of claim as it solely relates to the late-filing penalty because it states a "new" claim, and, therefore, it was filed outside the January 4, 1985 bar date. [The trustee no longer contests the other penalties on this ground.] The IRS, on the other hand, contends that the claim is merely an "amendment" to the original proof of claim, and, therefore, relates back to the timely filing of the original claim. Thus, the issue before this Court is whether a proof of claim which asserts a late-filing-penalty on the 1983 income tax is an amendment to an original proof of claim.

Generally, courts will allow amendments to proofs of claims in order "to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth on the original claim." *In re International Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir.1985) (*citing Szatkowski v. Meade Tool & Die Co.*, 164 F.2d 228, 230 (6th Cir.1947); and *In re G.L. Miller & Co.*, 45 F.2d 115 (2d Cir.1930). Still, this Court must carefully scrutinize post bar date amendments to assure that the claimant is not attempting to file a new claim under the guise of an amendment. *See In re Commonwealth Corp.*, 617 F.2d 415, 420 (5th Cir.1980). As such, Courts permit amendments only where the original claim provided notice to the court of the existence, notice, amount of the claim and that the creditor intends to hold the estate liable. *International Horizons*, 751 F.2d at 1217; *Walsh v. Lockhart Associates*, 339 F.2d 417, 418 (5th Cir.1964).

Applying the above-mentioned principles to the present case, this Court agrees with the trustee: The claim for a late-filing penalty is an entirely new and different claim from the original proof of claim which was for income tax due. The late-filing penalty may have been based on the income tax due, but it was an addition to the tax, not a tax in and of itself. The original claim did not provide fair notice to this Court or the trustee of the existence of the penalty, nature of the penalty, or the amount of the penalty. The original proof of claim was silent as to a late-filing penalty. This Court is compelled to find that the IRS is improperly attempting to file a new claim outside the bar date under the disguise of an amendment.

IRS argues that this Court should be more liberal in allowing the purported amendment because the IRS was forced to file its original proof of claim prior to the filing of the return or the audit. As a result, the IRS asserts that, due to no fault of their own, the original proof of claim was merely an estimate of the tax liability which should allow it to amend said claim to more accurately show the debtors' liability for income taxes and penalties.

This Court would be inclined to agree with the IRS if we were addressing the negligent understatement penalty or the substantial understatement penalty. The IRS would definitely need the return and an audit to determine the existence of these types of penalties. However, the trustee has withdrawn any argument pertaining to the timeliness of the claim for these penalties. The late-filing penalty, on the other hand, is an entirely different type of penalty. At the time of the filing of the original proof of claim, the IRS knew from its own records, its March 19, 1984 letter, and its attendance at creditors meetings, that the 1983 return was late. The IRS easily could have made a claim for the late-filing penalty when it filed its original claim.

### 2. "Reasonable Cause" for Failure to Timely File the Return

In the alternative, the trustee also submits there was "reasonable cause" for the failure to timely file the return. As stated earlier, the original due date for Hudson's tax return for fiscal year ending 1983 was January 15, 1984. *See* 26 U.S.C. § 6072(b). Hudson requested an automatic extension which extended the due date to April 15, 1984. On March 6, 1984, Walter Kellogg was appointed as trustee. Sometime after March 19, 1984, the IRS notified the estate that they would cancel the debtors' extension on March 29, 1984 unless the debtors immediately paid their estimated tax shown on the extension application. On June 9, 1986, the trustee filed the 1983 return, over two years past the deadline. On February 6, 1987, the IRS issued a 90-day letter and assessed, among others, a late-filing penalty pursuant to § 6651(a)(1).

Section 6651(a)(1) reads in pertinent part:
"In case of failure ... to file any return ... on the date prescribed therefor ..., **unless it is shown that such failure is due to reasonable cause and not due to willful neglect,** there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate...." (Emphasis added.)

The purpose of the civil penalty is to ensure timely filing of tax returns so that tax liability can be ascertained and paid promptly. *See United States v. Boyle,* 469 U.S. 241, 245, 105 S.Ct. 687, 689, 83 L.Ed.2d 622 (1985). To escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from "willful neglect," and (2) that the failure was "due to reasonable cause." *Id.*

■ The term "willful neglect" is not defined in the Internal Revenue Code. However, courts interpret the term to generally mean a conscious, intentional failure or reckless indifference on behalf of the taxpayer. *See Boyle,* 469 U.S. at 245–47, 105 S.Ct. at 689–91; *Hatfried, Inc. v. Commissioner,* 162 F.2d 628, 634 (3d Cir.1947); and *Janice Leather Imports, Ltd. v. United States,* 391 F.Supp. 1235, 1237 (S.D.N.Y. 1974).

In the present case, the record is completely void of any evidence indicating that the trustee's failure to file the return was willful or reckless. On the contrary, the evidence demonstrated that the trustee did all he could under the circumstances. He took over a very large business just prior to the deadline for filing the returns; he hired very competent accountants to investigate the 1983 tax liability and prepare the required return; and he filed a very long and detailed return which reported substantially all of Hudson's income for 1983. This Court finds that the trustee's failure to timely file the return was *not* due to any type of "willful neglect." *See, e.g., In re O'Neil,* 44 A.F.T.R.2d 79–5974, 79–5977 (W.D.Va.1979) (same question arose concerning bankruptcy trustee's late filing of return.)

■ Like the counterpart, the term "reasonable cause" is also not defined by the Internal Revenue Code. However, a relevant Treasury Regulation requires the taxpayer to demonstrate that he "exercised ordinary business care and prudence" but nevertheless was "unable to file the return within the prescribed time." *See* 26 CFR § 301.6651(c)(1) (1984). The Supreme Court has recently cited the regulation with approval. *Boyle,* 469 U.S. at 246, 105 S.Ct. at 690 and n. 4 ("Thus, the Service's correlation of 'reasonable cause' with 'ordinary business care' is consistent with Congressional intent, and over 40 years of case law as well.") *See also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, and n. 14, 104 S.Ct. 2778, 2782 and n. 14, 81 L.Ed.2d 694 (1984); and *Fleming v. United States,* 648 F.2d 1122, 1124 (7th Cir., 1981).

In his proposed conclusions of law, the trustee persuasively contends that "reasonable cause" exists for the following reasons:

Reasonable cause for late filing exists when a taxpayer, who has filed its return

after the due date, has done so in reliance on advice of tax counsel that the taxpayer should not file a return until all events have occurred that affect the accuracy of the return, even if occurrence of the events fall after the due date of the return.

\* \* \* \* \* \*

The 1983 return was due on or before March 29, 1984, the date the IRS informed Debtors that it would cancel the extension if the Debtors did not pay the estimated tax reflected on the extension. IRC § 6081(a) and (b). Since Debtors could not pay the estimated tax and Debtors advised the IRS it could not do so, the IRS cancelled the extension as of March 29, 1984. The Trustee could not have filed the return by March 29, 1984, because there was insufficient time remaining in which to file the return after the Trustee's appointment, given the condition of Debtors' books, the unavailability of the Price Waterhouse report, the incomplete DOL calculations, and the complexity of the return. The Trustee relied on Mr. Yarmchuk's advice that the return should not be filed until it was complete and accurate, which meant waiting until the damages were calculated by the DOL and the Price Waterhouse audit was complete. The Trustee has made and filed all required tax returns for Debtors' estate and the 1983 return reported all of the taxable income, which was substantial. The Trustee's failure to file the return prior to its due date was due to reasonable cause and not to willful neglect.

The IRS, on the other hand, attacks the trustee's "reasonable cause" defense on two fronts. The IRS asserts: (1) that the real reason the trustee filed the return late was because of his reliance on the accountant's determination that Hudson had no tax liability for 1983 upon which to base a late-filing penalty rather than because of his reliance on the accountant's advice that he should not file a return until all events occurred; and (2) that, in any event, the recent Supreme Court case of *Boyle* over-

rules the trustee's reliance on an accountant as a "reasonable cause" defense.

After reviewing the testimony of Yarmchuk, the accountant, and the testimony of Kellogg, the trustee, this Court finds the IRS' argument unpersuasive, and in some factual respects, inaccurate. The evidence at trial clearly supported the factual basis for the trustee's "reasonable cause" defense of reliance on an accountant's advice to not file the 1983 return until it was complete and accurate. Yarmchuk testified that he wanted to file a complete and accurate return, but because of the condition of the books and the shortcomings of the accounting system, he was concerned about the integrity of the numbers. Yarmchuk thought he should wait at least until Price Waterhouse completed its audit report of the companies' financial statement for the period January 1, 1983 to January 3, 1984, and the DOL completed its calculations. Yarmchuk advised the trustee of his concerns. The trustee testified that he relied on Yarmchuk's advice concerning the timing of the filing of the return.

Furthermore, this Court is not persuaded by IRS' argument that *Boyle* overrules the trustee's reasonable cause defense. In that case, the executor of a will, Boyle, retained an attorney, Keyser, to serve as attorney for the estate. Keyser informed the executor that the estate must file a federal tax return, but failed to mention the deadline for filing the return of June 14, 1979. The executor relied on Keyser for instruction and guidance and provided Keyser with all relevant information and records to file the return. He contacted Keyser a number of times during the summer of 1979 to inquire about the progress of the proceedings and the preparation of the tax return. Keyser assured the executor that he would notify him when the return was due and that the return would be filed "in plenty of time." When the executor called Keyser on September 6, 1979, he learned for the first time that the return was by then overdue due to a clerical oversight on Keyser's part. The executor met with Keyser on September 11, 1979, and the return was filed on September 13, 1979, three months late. The IRS

assessed a $17,124.45 penalty against the estate under section 6651(a)(1). The issue arose over whether a taxpayer's reliance on an attorney to prepare and file a tax return constitutes "reasonable cause" under section 6651(a)(1). The Supreme Court noted a split in the circuits and determined the time had "come for a rule with as 'bright' a line as can be drawn consistent with the statute and implementing regulations." *Boyle*, 469 U.S. at 247–48, 105 S.Ct. at 690–91. The Supreme Court then held that the failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under section 6651(a)(1). *Id.* at 252, 105 S.Ct. at 693.

This Court finds that the facts of Boyle are easily distinguishable from the facts of the present case; and that the IRS is mischaracterizing the trustee's "reasonable cause" defense as one of sole reliance on an agent just to invoke the *Boyle* brightline rule. Just because this case and the *Boyle* case both involve reliance on agents does not necessarily mean *Boyle* is controlling. *Boyle* involves a situation in which the taxpayer had the time to file the return to begin with, however, he argues that "reasonable cause" exists solely because he relied on a professional who drops the ball and misses the deadline. The facts of the present case are just the opposite. Certainly, the trustee relied on Yarmchuk to prepare and to file the return. However, Yarmchuk did not file the return late because he somehow mistakenly missed the deadline. Yarmchuk filed the return late because, in reality, he did not have sufficient time to prepare it. The trustee, his accountants, the estate, and the debtors were put in an impossible situation from the start when it came to filing the 1983 return on time. Hudson Oil Company and its many subsidiaries located all over the United States filed a voluntary chapter 11 petition for relief on January 3, 1984. At the time, the debtors were collectively the largest entity to ever file for bankruptcy in the District of Kansas. Hudson Oil Company alone listed: $32,845,324 of assets; $2,146,013 of priority debt; $10,045,411 of secured debt; and 1221 scheduled creditors. At this point Hudson, in its capacity of debtor-in-possession, was still in charge of all aspects of the business, including filing the 1983 tax return due on January 15, 1984. On January 13, 1984, the debtor-in-possession applied for and received an automatic extension until April 15, 1984. On February 10, 1984, several banks filed a motion for appointment of a trustee. This Court set the motion for hearing on March 5, 1984. That day the parties stipulated to the appointment of a trustee. Walter Kellogg was officially appointed trustee on March 6, 1984. At this point, the debtor-in-possession's responsibility to file the 1983 tax return shifted to the trustee, and the time to file the return was fast approaching. Only two weeks after the appointment, the trustee, through his financial manager, Dan Lain, received notice by the IRS that, unless the trustee paid over $1,000,000 of estimated pre-petition tax by March 29, 1984, the extension would expire. That notice gave the trustee only two options: (1) come up with $1,000,000 from a bankrupt entity to pay pre-petition taxes which the debtor-in-possession had estimated; or (2) meet the March 29, 1984 deadline by filing a return.

The Court finds that it was physically impossible for the trustee to have prepared the 1983 return within that three week period. The books and records of the company were in disarray. It took a team of Price Waterhouse accountants over a year to complete their audit of the financial records of the debtors, covering substantially the same period of time as the tax return. Price Waterhouse did not deliver the audit report until seven months after the trustee's appointment. Yarmchuk testified that he spent over 1,000 hours preparing the return which ended up to be over 200 pages long.

■ In the final analysis of the trustee's "reasonable cause" defense, this Court must sit back, look at the whole picture, and ask the question posed by the Treasury Regulation: Did the trustee exercise "ordinary business care and prudence" but nevertheless was "unable to file the return

within the prescribed time." The answer is clearly yes. It was physically impossible for the trustee to file the return in time. The IRS really gave him no choice but to allow the extension of time to expire. He reasonably relied on advice by the accountant that the return could not be filed until they were assured it was accurate and complete. Moreover, the trustee kept the IRS fully apprised of his reason for delay in filing the return. This Court finds that the trustee has shown that the failure to file the return was due to reasonable cause. As such, the IRS' imposition of the late-filing penalty under § 6651(a)(1) is also overturned on this ground.

## F. CIVIL PENALTIES FOR NEGLIGENT UNDERPAYMENT OF TAX— SECTIONS 6653(a)(1)(A) AND 6653(a)(1)(B)

The trustee also presents two alternative arguments against the IRS' assessment of two negligence penalties. First, the trustee contends that the IRS' assessment of both of the negligence penalties was erroneous because he reasonably relied on a professional's advice in completing the return. Second, the trustee contends that debtors are not liable for one of the penalties imposed pursuant to § 6653(a)(1)(B) of 50% of the interest calculated under § 6601 because interest is not payable under § 6601(a) in this case.

### 1. *Reasonable Reliance Defense*

The IRS assessed two penalties for negligent underpayment of tax pursuant to section 6653(a)(1) of the Internal Revenue Code which provides:

(a) **Negligence—**

(1) **In general.**—If any part of any underpayment (as defined in subsection (c) is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to the sum of—

(A) 5 percent of the underpayment, and

(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of

such underpayment which is attributable to negligence for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

According to its proposed conclusions of law, the IRS assessed both the subsection A penalty of 5% of underpayment and the subsection B penalty of 25% of interest payable under section 6601 for the following reasons:

Hudson had requested an extension in January of 1984 indicating an estimated liability of $1,900,000. In January of 1985, the Internal Revenue Service filed a proof of claim which estimated Hudson's tax liability at $1,028,902.... In June of 1986, over two years late, the Debtor filed the tax return showing a tax liability of $669.00. The deduction taken for the DOL and DOE are in clear derogation of Treasury Regulation 1.461-1(a) (26 CFR). Again, the debtor is conceding $6,000,000 of the deduction attributable to the DOE litigation, acknowledging that no reason existed to take that deduction. In addition, the Debtor attempted to take over $550,000 in deductions for entitlement receivable in which Hudson had no basis to deduct. The Debtor is not contesting that adjustment in this proceeding.

Section 6653(a)(1) permits the IRS to assess certain penalties when an underpayment "is due to negligence or intentional disregard of rules or regulations...." Under section 6653(a)(3), the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard. 26 U.S.C. § 6653(a)(3). Negligence under section 6653(a)(1) is determined by the reasonable, prudent person standard. *Zmuda v. Commissioner*, 731 F.2d 1417, 1422 (9th Cir.1984). The taxpayer bears the burden of establishing that the IRS' assessment of the negligence penalty was erroneous. *Id.;* and *Hanson v. Com-*

*missioner*, 696 F.2d 1232, 1234 (9th Cir. 1983) (per curiam).

In the present case, the trustee contends that the IRS' assessment of the negligence penalties was erroneous because he *reasonably relied* on Yarmchuk's advice in taking the disallowed deductions that resulted in a reported loss of $5,933,201 on the 1983 return.

Courts have found that while hiring an attorney or accountant does not necessarily insulate the taxpayer from negligence penalties, good faith reliance on professional advice is a defense. *See Betson v. Commissioner*, 802 F.2d 365, 372 (9th Cir.1986); and *Foster v. Commissioner*, 756 F.2d 1430, 1439 (9th Cir.1985). The Supreme Court, in dicta, has explained the rationale behind this reliance defense as follows:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. See *Haywood Lumber [v. Commissioner], supra*, [178 F.2d 769 (2nd Cir.1950)] at 771. "Ordinary business care and prudence" do not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 251, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1985). However, in order to properly claim reliance on a professional as a defense, the taxpayer must have provided the professional with all the necessary information to prepare the return, and the taxpayer must *not* have been on notice that the legal position asserted on the return was erroneous at the time. *See Betson*, 802 F.2d at 372; and *Foster*, 756 F.2d at 1439.

The IRS attacks the trustee's reliance defense on several fronts. First, the IRS argues the trustee admitted liability for the penalties by failing to contest the disallowance of several deductions, namely, $6,000,000 of the DOE deduction, the $970,000 breach of contract deduction, and the $550,000 entitlements deduction. Second, the IRS asserts that the trustee was put on notice that legal positions asserted on the return were erroneous by the debtor-in-possession's prior estimate back on January 13, 1984, of 1983 tax liability of in excess of $1,000,000 and by the IRS' January 4, 1985 proof of claim reflecting a tax liability of over $1,000,000. Third, the IRS asserts that the trustee failed to provide the accountant with all the necessary information.

 Although this Court agrees with the IRS that Hudson cannot take the deductions [*see infra*, "Subpart I. *DEDUCTIBILITY OF THE DEPARTMENT OF LABOR (DOL) LITIGATION AND THE DEPARTMENT OF ENERGY (DOE) LITIGATION*,"] the trustee's legal positions were, at the least, "reasonably debatable." The IRS must remember that the deductions were legitimate, i.e. valid expenses of the corporation. The trustee did not dream up the expenses. The trustee's only problem was the question of the timing of the deductions or the proper year in which to take the deductions. As to this question, the trustee presented a reasonably debatable case for taking the deductions in 1983.

 Moreover, this Court finds IRS' second argument that the prior estimates by both the debtor-in-possession and the government put the trustee on notice of the erroneous legal positions is also without merit. First, the liability reflected on the debtor-in-possession's application for extension was merely an estimate based upon entries in the accounts of the companies' books and records as of January 13, 1984. At that time, the books and records were in disarray. Any estimate based on those records was not reliable. Second, the IRS filed the original proof of claim prior to even auditing the debtors' records for 1983. As such, the IRS' estimate was also unreliable and would not put the trustee on notice.

■ However, this Court is persuaded by the IRS' third contention and finds: the trustee cannot raise the defense of reliance on an accountant if he fails to provide the accountant with all the information necessary to prepare the return. The record clearly reflects that the trustee failed to adequately advise Yarmchuk of the status of the litigation on which he based most of the disallowed deductions. Yarmchuk testified that he was not informed that the debtor intended to appeal the DOL matter, or that the debtor did not consider that order to be final. He testified he was not advised until the audit by the IRS that the DOE proceedings were being vigorously contested and appealed. He testified he was unaware that the entitlement receivables were never taken into income and that he was never informed of the active status of the breach of contract action. Simply put, the trustee failed to provide the accountant all the necessary information to prepare the return. As such, the trustee's reliance defense fails and the debtors are not relieved of liability for the negligence penalties on this ground.

2. *Applicability of § 6653(a)(1)(B) penalty.*

The trustee also contends that the debtors are not liable for the penalty imposed under section 6653(a)(1)(B) because that penalty is not applicable to this case. As stated earlier, section 6653(a)(1)(B) provides that if any part of an underpayment is due to negligence, there shall be added to the tax "an amount equal to 50 percent *of the interest payable under section 6601* with respect to the portion of such underpayment which is attributable to negligence for the period beginning on the last date prescribed by law for payment of such underpayment." The trustee asserts that since there is no interest payable under section 6601, 50% of zero is zero.

■ The IRS' proposed conclusions of law wholly fail to respond to the trustee's position. The argument certainly is not something new or out-of-the-blue. The trustee raised the argument in his contentions in the pretrial order. This Court could find that the trustee's position is uncontested and overturn the section 6653(a)(1)(B) 50% negligence penalty on this basis. However, this Court finds the trustee's position is legally persuasive, in any event. The IRS asserts a penalty pursuant to section 6653(a)(1)(B) for 50% of the interest under section 6601. No interest can accrue or be payable, however, under section 6601 because the interest had not matured as of the petition date. *See* 11 U.S.C. § 502(b)(2). Further, the IRS never claimed any interest under section 6601. (*See IRS' Proof of Claim filed January 4, 1985*). As such, since there is no interest payable, the IRS is not entitled to a negligence penalty based on interest.

G. CIVIL PENALTY FOR SUBSTANTIAL UNDERSTATEMENT UNDER § 6661—SUBSTANTIAL AUTHORITY DEFENSE AND ADEQUATE DISCLOSURE DEFENSE

The next issue is whether the IRS properly assessed the substantial understatement penalty pursuant to section 6661 of the Internal Revenue Code which in relevant part, provides:

(a) **Addition to tax.**—If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement.

(b) **Definition and special rule.**—

(1) **Substantial understatement.**—

(A) **In general.**—For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—

(i) 10 percent of the tax required to be shown on the return for the taxable year, or

(ii) $5,000.

(B) **Special rule for corporations.**—In the case of a corporation other than an S corporation or a personal holding company (as defined in section

954

542), paragraph (1) shall be applied by substituting "$10,000" for "$5,000".

**(2) Understatement—**

**(A) In general.—**For purposes of paragraph (1), the term "understatement" means the excess of—

(i) the amount of the tax required to be shown on the return for the taxable year, over

(ii) the amount of the tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2).

**(B) Reduction for understatement due to position of taxpayer or disclosed item.—**The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

\* \* \* \* \* \*

**(c) Authority to waive.—**The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

In the present case, the debtors filed a return indicating a 1983 tax liability of $669.00. After the audit of the return, the IRS determined that the debtors' 1983 tax liability was $1,980,331. As such, the IRS determined that the understatement was clearly a "substantial understatement" as defined in § 6661(b), and assessed a 25 percent penalty on the amount of the underpayment attributable to the understatement.

The trustee requests this Court to overturn the substantial understatement penalty on any one of the following grounds: (1) that under section 6661(c) there was rea-sonable cause for the understatement and that the taxpayer acted in "good faith;" (2) that under section 6661(b)(2)(B)(i) there was substantial authority for the treatment of the deduction; or (3) that under section 6661(b)(2)(B)(ii) there was adequate disclosure of relevant facts concerning the deductions on the return.

■ This Court finds that the trustee's reliance on section 6661(c) as authority for a "good faith" exception is not well founded. Section 6661(c) merely grants the Secretary of the IRS the authority to waive substantial understatement penalty upon a showing of good faith. Under the wording of the statute, this power is purely within the discretion of the Secretary, and not this Court.

However, the Court finds that the trustee's reliance on section 6661(b)(2)(B) as authority to reduce the understatement is entirely proper. Understatements are reduced to the extent they are attributable to *either* of the following: (1) the treatment of an item by the taxpayer for which there is or was substantial authority; or (2) an item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to it.

■ After reviewing the record, this Court further finds that the trustee has shown that there was at the least substantial authority for the deductions. Although this Court agrees with the IRS that the deductions should be disallowed [*see infra*, Subpart I. "DEDUCTIBILITY OF DEPARTMENT OF LABOR (DOL) LITIGATION AND THE DEPARTMENT OF ENERGY (DOE) LITIGATION"], the trustee still presented a very good argument on behalf of the deductions. This goes hand-in-hand with previous Subpart "F" in which the Court found that the trustee's position was "reasonably debatable." No one contests that the deductions are legitimate. The only question was one of timing. As to this question, this Court finds that the trustee had substantial authority for taking the deductions in 1983.

■ Furthermore, this Court finds that the trustee *adequately* disclosed on the return the relevant facts concerning the deductions under all the circumstances. The trustee did not attempt to mischaracterize the four deductions on the return in any way. On the same date the trustee filed the return, June 9, 1986, the trustee *requested* the audit of the 1983 return. When Joseph Dillingham, the IRS agent, began auditing the return at the debtors' office, he was taken into a room where Yarmchuk had laid out the return, the companies' general ledger, and the documentation supporting the four deductions to facilitate the audit. Yarmchuk specifically identified the deductions. The debtors' personnel fully cooperated with Dillingham and made no attempt to conceal any facts.

The IRS objects to the use of the adequate disclosure exception because, in their words, the adequate disclosure was not actually "on the return, or on statements filed with the return" as required by the statute. However, this Court finds this argument unpersuasive. The statute merely says the disclosure on the return must be "adequate." This Court finds that the disclosure on the return was more than adequate under the circumstances where a taxpayer requests the audit, points out the deductions, and provides supporting documentation. The IRS was not prejudiced by the manner in which the debtors handled the filing and the subsequent auditing of the return.

## H. DEDUCTION OF ALL OR PART OF THE CUSHING REFINERY BECAUSE OF ABNORMAL RETIREMENT OR OBSOLESCENCE

■ According to the trustee's brief in support of his proposed findings of fact and conclusions of law, the trustee relies on the theories of "obsolescence" or "abnormal retirement" to deduct on the 1983 return the excess of the tax basis of the Cushing refinery over its fair market value as of October 31, 1983 [The trustee appears to have dropped his contention that Hudson Oil "abandoned" the refinery in 1983.]

The theories of "obsolescence" and "abnormal retirement" are considered separate and independent grounds for a deduction under the Internal Revenue Code. However, after reviewing the relevant treasury regulations and applying the trustee's theories to the specific facts of this case, the theories become so hopelessly intertwined to the point that the analysis is substantially the same under either theory. The following discussion will bear this point out.

1. *"Obsolescence" and "Abnormal Retirement"—In General.*

Under section 167(a) of the Internal Revenue Code, a taxpayer may take an annual depreciation deduction for a reasonable allowance for the exhaustion, and wear and tear (including a reasonable allowance for normal obsolescence) of business and income producing property. The depreciation deduction is intended to permit the taxpayer to recover the cost or other basis of the property over its "useful life." At the end of the property's estimated useful life, the total depreciation deductions allowed plus the salvage value should theoretically equal its cost or other basis. *See* Treas.Reg. § 1.167(a)–1(a).

As stated earlier, normal obsolescence is taken into account in initially determining the useful life of property. Obsolescence can be defined as a type of functional depreciation, as distinguished from physical depreciation. *Real Estate–Land Title & Trust Co. v. United States,* 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542 (1940). Obsolescence is governed by Treas.Reg. 1.167(a)–9 which provides:

The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought

about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action.

However, the Code's inclusion of obsolescence as a factor in determining useful life gives rise to an inherent problem: a taxpayer cannot usually accurately foresee events causing obsolescence at the time they acquire assets and set up the depreciation schedules. Accordingly, it was early established that the useful life of an asset should be adjusted during the term of ownership to reflect developing obsolescence. *Tanforan Co., Inc. v. United States*, 313 F.Supp. 796, 801 (N.D.Calif.1970), *aff'd*, 462 F.2d 605 (9th Cir.1972). Thus, the above Treasury Regulation continues:

> In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete. For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated, see § 1.167(a)–8....

That last line is very relevant to this case: "For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated see § 1.167(a)–8." In this case the trustee is asserting a deduction for a loss due to the sudden retirement of the refinery because of extraordinary obsolescence. Treas.Reg. 1.167(a)–8 is the regulation governing deductions for loss due to retirement of "useful life" depreciable assets, and just so happens to govern the trustee's other theory, "abnormal retirement."

Treas.Reg. 1.167(a)–8(a)(3) provides in pertinent part that:

> Where an asset is *permanently* retired from use in a trade or business or in the production of income but is not disposed of by the taxpayer or physically aban-

doned (as, for example, when the asset is transferred to a supplier or scrap account) ... loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater, but only if (i) the retirement is an *abnormal retirement*.

(emphasis provided).

In determining whether a retirement is "abnormal," Treas.Reg. 1.167(a)–8(b) provides:

> For purposes of this section the determination of whether a retirement is normal or abnormal shall be made in the light of all the facts and circumstances. In general, a retirement shall be considered a normal retirement unless the taxpayer can show that the withdrawal of the asset was due to a cause not contemplated in setting the applicable depreciation rate. For example, a retirement is considered normal if made within the range of years taken into consideration in fixing the depreciation rate and if the asset has reached a condition at which, in the normal course of events, the taxpayer customarily retires similar assets from use in his business. On the other hand, a retirement may be abnormal if the asset is withdrawn at an earlier time or under other circumstances, as, for example, when the asset has been damaged by casualty or *has lost its usefulness suddenly as the result of extraordinary obsolescence.*

(emphasis added).

From these regulations, this Court can glean the following questions that must be answered before the trustee may take a deduction on the 1983 tax return:

1. Did Hudson Oil retire the Cushing refinery on or before October 31, 1983?

2. If so, was the retirement "abnormal" due to either a cause not contemplated in setting the applicable depreciation rate or from "extraordinary obsolescence?"

3. If so, what is the amount of loss?

### 2. Retirement of the Refinery Within the Tax Year Ending October 31, 1983.

As previously stated, under Treas.Reg. 167(a)–8(a)(3), an asset is retired for depreciation purposes when the taxpayer *permanently withdraws* the asset from use in the trade or business or in the production of income.

Clearly Hudson *withdrew* the Cushing refinery from use in its business in the 1983 tax year, starting November 1, 1982, and ending October 31, 1983. Hudson shut down the refinery in December of 1983. Hudson has never reopened the refinery. The more difficult question is whether the withdrawal was *permanent* as of October 31, 1983. However, after reviewing the entire record, this Court must conclude that, at least as of October 31, 1983, Hudson's withdrawal of the asset from its business was *not* permanent.

This Court reaches this conclusion for a number of reasons. First, there is no question that, at the time the refinery was initially closed in December of 1983, Hudson did not consider the withdrawal to be permanent. Both Forest Fugua, plant manager of the refinery, and Thomas Raimo, president of Hudson, testified that they thought the refinery would eventually reopen. After the shutdown, Hudson took the necessary steps to protect the refinery equipment for that possibility. Second, Hudson did nothing during the 1983 tax year that would suggest that the withdrawal became permanent rather than temporary. Hudson began terminating most of the refinery's employees during the course of the 1983 tax year. However, Hudson never advised the union workers that the shut-down was permanent or that severance pay would be forthcoming as of October 31, 1983. Even Fugua was never told outright that the shut-down was permanent. Hudson never notified their shareholders that the shut-down of the refinery, a very substantial asset, was permanent in nature. Finally, Hudson did not carry the asset on its books as being permanently withdrawn. In the audit report issued by Price Waterhouse for the period from December 31, 1982 to January 4, 1984, there is no mention that the main asset of Hudson Refinery Company, Inc., the refinery, was considered permanently retired. In fact, the debtor still carries the refinery on its books in a fixed asset account and takes depreciation on it.

The Court notes that the trustee presented the testimony of Raimo, the president of Hudson, in support of his position. Raimo unequivocally testified that he considered the refinery to be closed permanently by the end of the 1983 tax year. Other Hudson personnel, including Fugua and Dan McClean, vice-president of Hudson, testified in support of Raimo's conclusion. In addition, the Court notes that the trustee relies on his own testimony that Hudson removed the refinery's vital platinum catalyst during the 1983 tax year.

However, after reviewing all the circumstances, this Court is *not* persuaded by the trustee's evidence. Raimo's testimony is rebutted by the unbiased testimony of Martin Sallay, the Price Waterhouse auditor. He testified that Hudson had not written the refinery off its books as of the time of his audit in 1984. In fact, papers prepared by Sallay contain a reference to a conversation Sallay had with Raimo concerning severance pay for the workers. Sallay noted that the severance liability had never been recorded "because it was expected that the refinery would reopen, employees would be rehired, and no severance pay would be paid. Mr. Raimo stated that as a result of the bankruptcy [which occurred after October 31, 1983] it appears that the refinery will not open and as a result the company will have a severance pay liability."

In addition the trustee's self-serving testimony concerning the removal of the catalyst is also suspect. Fugua, the plant manager whose office is actually located at the refinery, testified that Hudson did not remove the catalyst until October of 1984 or 1985, clearly outside the 1983 tax year. This Court finds Fugua's testimony the more credible on this question.

### 3. Requirement that the Retirement be "Abnormal" and Calculation of Loss.

Since this Court has just found that Hudson did *not* retire the refinery within the

1983 tax year, there is no need to determine if the retirement was "abnormal," i.e. due to extraordinary obsolescence. Of course, before there can be an "abnormal" retirement there must first be a retirement. Furthermore, since this Court found that Hudson did not retire the refinery within the 1983 tax year, the question of the amount of loss is also moot.

## I. DEDUCTIBILITY OF THE DEPARTMENT OF LABOR (DOL) LITIGATION AND THE DEPARTMENT OF ENERGY (DOE) LITIGATION

As stated earlier, the IRS disallowed entirely the salary expense deduction of $3,460,517 arising out of the DOL litigation, and a cost of sales and interest deduction of $7,388,360 arising out of the DOE litigation. The IRS disallowed the deductions because the trustee took the deductions in the wrong year.

The trustee still maintains that Hudson Oil is entitled to deduct the $3,460,517 DOL expense deduction in the 1983 tax year. The trustee argues that after applying the "all events test," the debtors are entitled to the DOE deduction because United States District Court's order dated October 14, 1983 fixed the debtors' liability and established in 1983 the formula by which the liability was determinable. As for the DOE deduction, the trustee is now conceding that $6,000,000 of the DOE deduction was taken in the wrong year. However, the trustee still claims a reduced DOE expense deduction of $1,405,124. The trustee argues that after applying the "all events test," the debtors are entitled to a deduction of $1,405,124 for the DOE litigation because Hudson Refinery's admission to the $945,550 of the violations fixed Hudson's liability in 1983 with accrued interest.

Although this Court has found the trustee's arguments reasonably debatable [*see supra* Subpart F. *"CIVIL PENALTIES FOR NEGLIGENT UNDERPAYMENT OF TAX"*] and supported by substantial authority [*see supra* Subpart G. *"CIVIL PENALTY FOR SUBSTANTIAL UNDERSTATEMENT"*], this Court agrees with the IRS that, under the "all events test",

that the trustee cannot take the deductions in 1983.

■■■ The question of the proper year in which to take a deduction for contested matters is governed by the "all events test." *See United States v. General Dynamics Corporation*, 481 U.S. 239, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1985). Under section 461(a) of the Internal Revenue Code, "[t]he amount of any deduction ... shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Hudson is an accrual method taxpayer with a fiscal rather than calendar year. Since Hudson is an accrual method taxpayer, Treas.Reg. 1.461–1(a)(2) governs the timing of Hudson's deductions and provides:

> Under the accrual method of accounting for the taxable year in which all events have occurred which determine the fact of the liability and the amount can be determined with reasonable accuracy.

As a result, an accrual method taxpayer may not deduct an expense until the expense and the amount of that expense is known or can be determined. Where the taxpayer is contesting liability for the expense, Treas.Reg. 1.461–1(a)(3)(ii) provides:

> Where there is a dispute and the entire liability is contested, judgment on account of damages for patent infringement, personal injuries *or other causes, or other binding adjudications*, including decisions of referees and boards of review under workmen's compensation laws, are deductions from gross income *when the claim is finally adjudicated* or paid, depending upon the taxpayer's method of accounting. However, see subparagraph (2) [set forth above] of this paragraph.

(emphasis added).

■■■ Where the taxpayer disputes a liability in court, the taxpayer may not take a deduction until a final order is entered, no appeal taken, and/or the suit is finally settled. Courts have long held that, to deduct a liability, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for the items of

indebtedness deducted though not paid; and this cannot be done where the liability is contingent and is contested by the taxpayer. *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516, 519, 64 S.Ct. 364, 365, 88 L.Ed. 270 (1944). According to one court, "the existence of any liability is uncertain until the last bell is rung in the last court." *United States v. Texas Mexican Railway Co.*, 263 F.2d 31, 34 (5th Cir.1959). The question of when "the last bell is rung" has been resolved by determining the final date for appeal. *Commissioner v. Fifth Avenue Coach Lines, Inc.*, 281 F.2d 556 (2d Cir.1960), *cert. den.* 366 U.S. 964, 81 S.Ct. 1915, 6 L.Ed.2d 1256 (1961). In *Fifth Avenue*, the taxpayer attempted to deduct in 1948 interest on deficiencies determined by the Tax Court in an order entered on December 22, 1948. The court found that the time for appeal did not run until March 22, 1949. Accordingly, the order was not final and the liability not fixed until 1949. Similarly, the Ninth Circuit has held that if "appeal is taken the right is not fixed until determination of the appeal; and if no appeal is taken, ... the right becomes fixed on termination of the appeal time." *H. Liebes & Co. v. Commissioner*, 90 F.2d 932, 938 (9th Cir.1937).

■ Applying these principles to the DOL deduction, this Court finds that Hudson cannot take the deduction for the fiscal year 1983. A final judgment had not yet been entered by the United States District Court. The Memorandum and Order entered by the District Court on October 14, 1983 was not final. No judgment amount was entered and the calculations for determining an amount had not even begun. In the Motion to Resolve Federal Tax Liability of Debtor, the debtor admits that one of the "reasons" for delay in filing the return was that the DOL liability could not be calculated. A final calculation was not made until June of 1985. Even at that time, a final judgment was not entered. In fact, the debtor has stipulated that Hudson's liability on the DOL claim would have been $8,937,165, yet Hudson's liability in the proposed settlement pending before this Court is for only $3,460,517. There has yet to be an approval by this Court

even for that settlement amount. In fact, Hudson is attempting to deduct for fiscal year 1983, the settlement amount reached sometime between June of 1985 and June of 1986. The trustee has continued to list the DOL claim as contingent and disputed on the financial statements filed with this Court and states on those statements that the amount of the liability cannot be determined. Further, the trustee stated to this Court that when that order became appealable, it would be appealed.

Furthermore, even if the Memorandum and Order of October 14, 1983 could be considered to be a "final" order, the appeal time would not have run until December 13, 1983. Rule 4(a)(1), Appellate Rules of Procedure. The date of December 13, 1983 was clearly after the close of fiscal year 1983. Accordingly, Hudson may not deduct the amount attributed to the DOL litigation in 1983. *Commissioner v. Fifth Avenue Coach Lines, Inc.*, 281 F.2d 556 (2d Cir.1960), *cert. denied* 366 U.S. 964, 81 S.Ct. 1915, 6 L.Ed.2d 1256 (1961).

■ As for the DOE deduction, this Court also finds that Hudson cannot take *any* of the deduction for the 1983 tax year. On February 23, 1983, the Department of Energy issued a Proposed Remedial Order citing Hudson for violations of various regulatory programs. On May 23, 1983, Hudson responded by arguing that the entire proceeding had to be dismissed. Hudson did contend that, in the alternative, they might be liable for some amount. On July 22, 1983, Hudson filed another response asserting that the entire proceedings must be dismissed because the regulatory scheme under which Hudson was being cited was unconstitutional. The Office of Hearings and Appeals did not enter a decision on the record until July 1, 1985. The decision itself states: "If Hudson's objections are sustained, the February 28, 1983 PRO would be rescinded." Record of OHA, p. 101. Thus it is clear, that, as of July 1, 1985, Hudson continued to contest the DOE litigation in its entirety. Further, on September 19, 1985, Hudson filed its appeal of the OHA decision to the Federal Energy Regulatory Commission, again con-

testing the validity of the order in its entirety. That Hudson argued in the alternative for a lesser liability cannot change the fact that the full liability continued to be disputed through 1985.

## J. DEDUCTIBILITY OF THE "WING SIGNS."

■ According to his proposed conclusions of law, the trustee also attempts to deduct $85,892 in "wing signs" for the following reasons:

> Debtors are entitled to deduct the $85,-892, the value of the wing signs, from their 1983 tax year income because the signs were unsalable by Hudson at normal prices or unusable in the normal way. Treas.Reg. § 1.47–2(c).

Unfortunately, that is *all* the trustee says on this contention. The trustee fails to provide this Court with any analysis or additional authority in support of this quite substantial deduction.

This Court finds that the deduction is improper for the 1983 tax year. Raimo testified that the signs were useless to Hudson by October 31, 1983. However, Hudson continued to have 90 to 98 operating gasoline stations during that time. Furthermore, Revenue Agent Dillingham testified that Hudson did not actually write the signs off their book until March 29, 1984. The 1984 tax year is the more appropriate year in which to take the deduction. Accordingly, this Court finds that the trustee may not claim a deduction for the wing signs.

## K. OFFSETTING THE 1980 OVERPAYMENT, INTEREST, AND 1983 REFUND AGAINST THE 1983 TAX LIABILITY.

■ The issue in this section is not whether the debtors are entitled to a refund from 1980. Back on January 14, 1983, the IRS determined that Hudson Oil was entitled to a refund of $895,601 for the taxable year 1980. More than a year ago, the Joint Committee on Taxation advised the IRS that it had no objection to the refund. Since then, the IRS has withheld the refund pending determination of the debtors' tax liability for the 1983 tax year. The issue is not even whether the IRS should offset the refund. Both sides assert that the IRS should offset the refund. Rather, the issue is over the *timing* of the offset. The trustee asserts that the IRS should have offset the $895,601 against the amount of the 1983 income tax *liability* determined before the IRS assessed the penalties, thereby, lowering the amount of liability upon which the IRS based the penalties. The IRS, on the other hand, seeks to determine the tax liability, assess the penalties on that liability, and then offset the refund against the *penalties.*

The trustee presents two arguments in support of his position. First, the trustee asserts that sections 6651 and 6402 of the Internal Revenue Code require the IRS to credit the refund against the tax liability before calculating the late-filing penalty. Second, the trustee asserts that section 106 of the Bankruptcy Code allows the trustee to "elect" to credit the overpayment, plus interest, plus a 1983 refund claim of $49,-156 against the tax liability.

As the first argument goes only toward the calculation of the late-filing penalty, this Court need not address this contention. This court has already overturned the late-filing penalty on two independent grounds. As such, a question concerning how to calculate the penalty is now moot.

However, the trustee's second contention under section 106 is not moot because it pertains to all penalties. Section 106 of the Bankruptcy Code governs the government's waiver of sovereign immunity in bankruptcy cases. Section 106(b) provides:

> (b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

The Committee Notes following this subsection further explains that:

> ... the estate may offset against the allowed claim of a governmental unit, up to the amount of the governmental unit's claim, any claim that the debtor and thus the estate, has against the governmental unit, without regard to whether the estate's claim arose out of the same trans-

action or occurrence as the government's claim.

In this case, the trustee "invokes his right to offset the overpayment ($895,601), interest and the 1983 refund claim of $49,156 against any tax liability found to be due for the 1983 tax year before any allowed penalties are calculated."

This Court agrees with the trustee's contention up to a point. Courts have found that section 106 empowers the trustee to assert a setoff claim and thereby pierce the governmental unit's sovereign immunity whenever the governmental unit files a proof of claim. *See Merritt Commercial Savings and Loan, Inc. v. Giunee,* 766 F.2d 850, 854 (4th Cir.1985). However, it does not follow from section 106 that the trustee can rewrite the IRS' claim and force them to offset the refund against the tax liability *before* calculating the penalties. On the contrary, section 106(b) speaks in terms of offsetting against the government's "claim." In this case, the government's proof of "claim" is for the penalties. That is what the IRS filed a claim for and that is what the trustee can offset against, the penalties, not the underlying tax liability.

### L. TRUSTEE'S CLAIM TO LARGER REFUND IN 1983 IF THE OVERPAYMENT IS OFFSET.

The Court notes that the trustee asserts that the estate "is entitled to a larger refund for the 1983 tax year, after effect is given to loss carrybacks, if it is necessary to use all or any part of the 1980 refund of $895,601, accrued interest and refund to reduce income for the 1983 tax year." This contention appears to be contingent on whether the Court allowed the trustee to first offset against the tax liability rather than the penalties. Since this Court did not, this contention is now moot.

### ORDER

The above Memorandum Opinion constitutes my findings of fact and conclusions of law. The parties are directed to submit to this Court within 30 days an agreed order applying the memorandum opinion to

determine Hudson Oil's exact tax, interest, and penalty liability for the year ending on October 31, 1983. These findings of fact and conclusions of law shall not be considered final for appeal purposes until the Court signs the agreed order. The agreed order is as to form only and shall not constitute a waiver of rights by any parties upon appeal.