STATE of Alaska, DEPARTMENT
OF REVENUE, Appellant,

v.

ATLANTIC RICHFIELD COMPANY
and Combined Subsidiaries,
Appellee.

No. S–4820.

Supreme Court of Alaska.

Aug. 6, 1993.

Rehearing Denied and Motion
for Clarification Granted
Oct. 29, 1993.

**308**

Ellen Toll, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellant.

Robert E. McManus, Peter J. Turner, ARCO Alaska, Inc., Anchorage, and William B. Rozell, Mala J. Reges, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellee.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

This case concerns the tax liability of Atlantic Richfield Company and Combined Subsidiaries ("ARCO") for the years 1978–81 under two sections of AS 43.21, the Alaska Oil and Gas Corporate Income Tax (repealed effective January 1, 1982). Two distinct issues are presented on appeal. The first issue, the Trans Alaska Pipeline System ("TAPS") interest issue, involves the interpretation of AS 43.21.030, since repealed, and 15 AAC 21.350(b).[1] The second issue, the entitlements issue, concerns the interpretation of AS 43.21.020, since repealed, and 15 AAC 12.120 [2] and the valuation of Alaska North Slope ("ANS") oil produced and refined by ARCO.

After a formal hearing before the Department of Revenue ("DOR"), the hearing officer concurred in the Oil and Gas Division's interpretations of the statute and regulations, and upheld the tax assessment against ARCO on both issues. ARCO appealed to the superior court and the superior court reversed DOR's decision, holding that the plain meaning of the statute and regulations at issue precluded taxation of ARCO. DOR appealed. We affirm in part and reverse in part.

## II. DISCUSSION

### A. Standard of Review

■ As the superior court acted as an intermediate court of appeal, this court owes "no deference ... to the lower court's decision," but, rather, "independently scrutinize[s] directly the merits of the administrative determination." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987). In this case, the court is examining an administrative regulation and the agency's interpretation of that regulation. Such an interpretation is a question of law. *Borkowski v. Snowden*, 665 P.2d 22, 27 (Alaska 1983). This court has set forth two standards of review applicable to questions of law: (1) the rational basis standard under which the court defers to the agency's interpretation unless it is unreasonable; and (2) the substitution of judgment standard under which the court interprets the statute and regulation independently. *Tesoro*, 746 P.2d at 903. The rational basis standard is used where the questions of law involve agency expertise or where the agency's specialized knowledge and experience would be particularly probative as to the meaning of the statute. *Union Oil Co. of California v. State*, 804 P.2d 62, 64 (Alaska 1990). The two issues in this case center around the interpretation of a complex tax statute and regulations that implicate the special expertise of DOR. Therefore we apply the rational basis standard of review.

### B. TAPS Interest Issue

■ The construction of the Trans Alaska Pipeline System was completed in 1977. ARCO Pipe Line Company ("APLC"), a subsidiary of ARCO, owned approximately 21% of TAPS during the tax years at issue. In order to finance its share of TAPS construction, APLC borrowed more than $1.8 billion dollars from third parties. On its tax returns for 1978–81 ARCO claimed interest deductions under AS 43.21.030(a) and 15 AAC 21.350(b) of approximately $538

---

**1.** The regulation in its original form, 15 AAC 12.350, was amended and recodified in 1985 to its current form, 15 AAC 21.350. The amended regulation applies to the tax years in question.

**2.** The regulation in its original form, 15 AAC 12.120, was amended and recodified in 1985 to its current form, 15 AAC 21.120. The original regulation applied to the tax years in question.

million for pipeline construction expense. Alaska Statute 43.21.030 reads, in part:

**Determination of income from oil and gas pipeline transportation.** (a) Except as provided in (c) of this section, taxable income attributable to the transportation of oil in a pipeline engaged in interstate commerce in Alaska shall be determined by the department and shall be the amount reported or that would be required to be reported to the Federal Energy Regulatory Commission or its successors as net operating income, *less those portions of interest and general administrative expense attributable to the pipeline transportation of oil in the state,* except that taxable income shall also include taxes on or measured by income. The department shall establish regulations governing the determination of interest and general administrative expense attributable to pipeline transportation of oil in the state.

AS 43.21.030 (repealed eff. 1/1/82) (emphasis added).

In 1978 DOR promulgated 15 AAC 12.-350(b) in accordance with the legislative directive. The regulation, as amended in 1985, read, in part:

(b) In addition to the amounts included in the [Federal Energy Regulatory Commission] accounts listed in (a) of this section, the operating expenses during a year for an oil pipeline also include

(1) accruals to third parties during that year, by any member of the consolidated business of which the taxpayer is a part, *for uncapitalized interest on capital borrowed to acquire, construct, or enlarge the facilities of the pipeline....*

15 AAC 21.350(b)(1) (emphasis added).

The Oil and Gas Division of DOR employed an apportionment formula to calculate ARCO's interest expense. The Division's formula calculated allowable interest as a portion of ARCO's total assets:

$$\text{ARCO's allowable interest expense} = \text{ARCO's total interest expense} \times \frac{ARCO\text{'s TAPS assets}}{\text{ARCO's total assets}}$$

Under this formula the Division allowed only $181 million in deductions. The disagreement between the parties centers on the interpretation of the statute and regulation.

1. *DOR's use of an apportionment formula to determine allowable interest expense deductions under 15 AAC 21.350(b) is inconsistent with the language of the regulation.*

ARCO's basic argument is that the use of an apportionment formula is contrary to the plain language of the regulation promulgated by DOR.[3] ARCO contends that

the language of 15 AAC 21.350(b)(1) requires only that (1) the principal be borrowed from a third party, and (2) the funds be used to acquire, construct, or enlarge TAPS. Since both parties agree that ARCO met these requirements, ARCO argues that it is entitled to the full deduction.

DOR does not directly address ARCO's plain language argument. Rather, DOR states that an apportionment formula is consistent with the statute and more accurately reflects the substance of ARCO's TAPS loan transactions. DOR points out that the debt incurred by APLC was not

---

**3.** ARCO also argues at length that DOR had a consistent and longstanding record of construing the regulation to allow full deduction of interest expenses claimed and that therefore DOR is obliged to continue to follow that interpretation.

Even if ARCO established prior and longstanding inconsistent interpretations of the regulation by DOR, DOR correctly points out that it has the power to correct its mistakes retroactively. This court recognized in *Wien Air Alas-*

*ka, Inc. v. Department of Revenue,* 647 P.2d 1087 (Alaska 1982), that DOR can " 'correct mistakes of law in the application of the tax laws ... even where a taxpayer may have relied to his detriment....' " *Id.* at 1095 (quoting *Dixon v. United States,* 381 U.S. 68, 72–73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965)). Thus ARCO's argument that DOR's current interpretation of the regulation is inconsistent with, and precluded by, prior interpretations fails.

secured by the assets of APLC, but by the assets of ARCO.[4] In substance, then, the debt incurred by APLC to construct TAPS was not fully "attributable to the pipeline transportation of oil in the state" as required by the statute, but was partially attributable to the assets of ARCO. DOR thus reasoned that since the debt of APLC was secured by the assets of ARCO as a whole, the interest paid on the debt was attributable to the assets of ARCO as a whole. Therefore an apportionment formula was appropriate.

DOR is correct in suggesting that the statutory language "portions of interest ... attributable to" allows the use of an apportionment method. However, in emphasizing the language of the statute, DOR does not effectively deal with the plain language of the regulation: operating expenses include "accruals ... for uncapitalized interest on capital borrowed to acquire, construct, or enlarge the facilities of the pipeline." The regulation does not indicate that interest expense deductions are limited in any way other than that the money be borrowed from a third party for the purpose of constructing TAPS.

When DOR wrote the regulation, it was aware of the debt/equity structure of the pipeline subsidiaries and the financing incentives created by the consent decree.[5] At that time DOR could have written an apportionment regulation and defended it

as consistent with the statute. The regulation as written, however, cannot be reasonably read to allow the use of an apportionment formula.

We conclude that the language of 15 AAC 21.350 precludes the use of an apportionment formula by DOR to calculate allowable interest expense for debt incurred to construct TAPS.

C.   Entitlements Issue

■   The entitlements issue concerns the valuation and taxation of Alaska North Slope ("ANS") oil from July 1979 to April 1980 under AS 43.21.020 and 15 AAC 12.-120. During this period, a combination of federal price control programs worked to place ANS oil in a unique situation. When ANS oil was first produced in 1977, along with almost all domestic crude oils, it was subject to federal price control regulations. These regulations set maximum prices, "ceiling prices," that could be charged for the oil at the wellhead in order to keep domestic oil acquisition costs low. Foreign oil, in contrast, was not subject to price controls. Therefore refiners who had access to primarily domestic crude oil had an advantage as they paid less for their price-controlled oil. In order to address this competitive disadvantage, at the same time it enacted price controls the federal government enacted · an entitlements program. Essentially, the entitlements program re-

4.   DOR's argument is based on the substance of pipeline loan transactions governed by a consent decree entered into in 1941 by several large shipper-owned pipeline companies with the United States Department of Justice resolving an antitrust suit. The consent decree, among other things, limited the amount of the annual dividend a pipeline was allowed to pay its shipper-parent to 7% of the valuation of the pipeline. This limitation, however, did not vary with the amount of equity capital of the pipeline company. The decree also did not affect the ability of the pipeline companies to pass through any and all interest expense for debt incurred to finance the pipeline to their shipper-parents. In combination, these two facts encouraged parent companies to finance their pipeline subsidiaries construction with debt rather than equity. Recognizing the financial incentives the consent decree created, most parent oil companies created high debt-equity ratios for their pipeline subsidiaries. As a result of this structure, subsidiaries were unable to

obtain the high levels of debt they desired at favorable interest rates without parent company guarantees of repayment. This is, in fact, how APLC, with assets of approximately $280 million, managed to borrow nearly $1.88 billion—the principal and interest payments were guaranteed by ARCO.

5.   DOR has stated that the "intent of the regulation was to prevent collusive sham transactions, entered into for the primary purpose of tax reduction." *In Re Amerada Hess Corp. & Amerada Hess Pipeline Corp.*, Rev.Dec. No. 83–31 (1983). The debt/equity structure of APLC, as noted above, was entered into in order to gain financial benefits created by the consent decree. However, this structure was in place before the statute and regulation at issue were even written. Therefore there is no allegation that ARCO created a "sham transaction" in order to reduce its taxable income in Alaska.

quired a refiner processing price-controlled oil to pay an entitlements penalty that was roughly equal to the price difference between price-controlled oil and foreign oil.[6]

ANS oil's unique status resulted from the fact that although it was price-controlled, it was not subject to an entitlements burden. ANS oil was exempted from an entitlements burden in order to encourage development of the North Slope and to compensate for the high transportation costs· of ANS oil to the refineries. Until mid–1979 ANS oil wellhead value remained below the ceiling price. As oil prices rose quickly in 1979 and 1980, however, the wellhead value of ANS oil as calculated by the State rose above the ceiling price. The market price of ANS oil, however, was limited to the ceiling price. At this point, ANS became unique. Although price controlled, no entitlements burden was placed on a refiner who refined ANS oil. Under the federal regulations, an integrated producer/refiner such as ARCO could refine the oil and realize the full value of the ANS oil as it did not have to pay any entitlements penalties.

### 1. *The income ARCO realized due to the federal price control structure reflects value inherent in ANS oil.*

The first issue this court addresses is whether or not the entitlements benefit ARCO received from internally transferring and refining price-controlled ANS oil qualified as taxable income under AS 43.-21.020. The statute read, in part:

> **Determination of taxable income from oil and gas production.**
>
> . . . .
>
> (b) Gross income of a corporation from oil and gas production *shall be the gross value at the point of production of oil or gas produced from a lease or property in the state.* The department shall by regulation determine a uniform method of establishing the gross value at the

point of production. In making its determination the department may use the actual prices or values received for the oil or gas, the posted prices for the oil or gas in the same field, or the prevailing prices or values of oil or gas in the same field.

AS 43.21.020(b) (repealed· eff. 1/1/82) (emphasis added).

ARCO contends that any income derived as a result of the entitlements program was attributable to the refining sector of the company and was taxable under AS 43.21.040 as non-pipeline income, not under AS 43.21.020 as production income. ARCO argues that since the income could not be realized until the oil was refined, and *"all* of the operating activity necessary to earn [the entitlements] benefits was conducted at out-of-state refineries," the income was downstream income, not production income. ARCO additionally maintains that the value realized was attributable to the federal price control programs, and was not value inherent in the oil itself. ARCO points out that were it not for the artificial price structure imposed by the federal government, the entitlements benefit would not exist. Therefore, ARCO concludes that the income was properly attributed to the refining sector, and should be taxed as earned income in the refining state rather than as production income in Alaska.

While ARCO's argument has some merit, we find DOR's position more persuasive. DOR points out that the value was not *earned* by the refinery; the refining process merely released the value already present in the oil. Both common sense and our decision in *Atlantic Richfield Co. v. State,* 705 P.2d 418 (Alaska 1985) (*"ARCO"*), support DOR's argument. In *ARCO,* this court upheld the constitutionality of AS 43.21. Although that case did not directly address this issue, the general reasoning of the case supports DOR's argument. We acknowledged that oil must go

---

**6.** Refiners earned fractions of entitlements for each barrel of oil they refined, domestic or foreign. If the amount they earned did not equal the amount required for the number of price-controlled barrels they refined, the refiner

was obligated to buy extra credits from refiners who had a surplus. In this way, the benefits of price-controlled oil were distributed among all refiners.

through various stages (transportation, refining, marketing) before it is sold for value to consumers. *Id.* at 421–22. We recognized that "[o]bviously, profits do not result from crab fishing or oil production until the product is sold." *Id.* at 425. However the mere fact that goods must be sold "does not negate the fact that profits generated by the sale are partly attributable to the inherent value of the crab or oil at its point of production." *Id.*

This language recognizes that oil has a value as it comes out of the ground. The fact that the oil's sale price was artificially limited by the federal government does not negate the fact that the value of the oil was higher than its ceiling price. In this case, ARCO was able to realize that value because of the structure of the federal price programs. Intuitively, it makes sense to reason that although ARCO recorded only the ceiling price on its books as the value of the oil entering the refinery, in reality the oil had a higher value as evidenced by ARCO's high level of refinery profits. That amount reflected the value of the oil as it came out of the wellhead, not value that was created by the refining process. We conclude that the income ARCO realized was due to value inherent in the oil at the point of production and was therefore taxable under AS 43.21.020.

2. *DOR's interpretation of 15 AAC 12.120 to allow taxation of the entitlements benefit is consistent with the language of the regulation.*

■ ARCO contends that even if the income received from the entitlements benefit was taxable as production income under AS 43.21.020, 15 AAC 12.120 precluded taxation. The regulation provided, in part:

**Value at the point of production.** (a) The value at the point of production for oil or gas produced from a lease or property is the *sales price* of that oil or gas, minus the reasonable cost of transporta-

tion (if any) from the point of production for that oil or gas to the sales delivery point for that oil or gas; *except that in no event may the value at the point of production for a taxpayer's oil or gas exceed the ceiling price (if any) that is applicable to that oil or gas under a mandatory price control program.*

(b) For purposes of this chapter, *"sales price"* means

(1) for a taxpayer's oil and gas *sold in a bona fide, arm's length sale to a third party, the cash value of the full consideration given and received for that oil and gas* ...

(2) for a taxpayer's oil *not sold in a bona fide, arm's length sale to a third party, the total acquisition cost for imported oil of similar quality* delivered F.O.B. at the gate of the refinery to which the taxpayer's oil is ultimately delivered....

15 AAC 12.120 (emphasis added).

ARCO does not dispute that under subsection (b)(2) the sales price for the ANS oil internally transferred was the cost for similar foreign oil. ARCO argues, however, that the regulation did not allow taxation on the full price, but only on the amount equal to the ceiling price. ARCO points to the language of section (a) of the regulation to support its argument. This language states that the income to be taxed, the value at the point of production, is the sales price, "except that in no event may the value at the point of production for a taxpayer's oil or gas exceed the ceiling price (if any) that is applicable to that oil or gas under a mandatory price control program." ARCO rests its argument on the phrase "in no event may the value ... exceed the ceiling price." As ANS oil was subject to a ceiling price during this time period, ARCO contends that DOR is precluded by the regulation from taxing any amount over the ceiling price.[7]

---

**7.** ARCO also contends, as in the TAPS interest issue, that DOR had a previous and longstanding interpretation of the regulation that precludes the present interpretation. In this situation, as in the TAPS interest issue, there is insufficient evidence supporting ARCO's conten-

tion. Furthermore, as noted above, even if a prior interpretation were proven, DOR has the right and duty to correct mistakes in application of the tax law. *Wien Air Alaska, Inc. v. Department of Revenue,* 647 P.2d 1087, 1095 (Alaska 1982).

DOR argues that ARCO's reading of the regulation fails to take into account the language of the entire regulation. DOR relies on the language providing that value may not "exceed the ceiling price *(if any) that is applicable.*" This language, DOR contends, reflects the policy that if federal price ceilings limit the amount of income received, the ceilings should also limit taxes. In other words, if ARCO only realized income equal to the ceiling price for its oil, then in all fairness it should be taxed on only that amount. Due to the structure of the federal price control program, however, ARCO realized income equal to the market value of the ANS oil. Since ARCO's income was not in fact limited by the ceiling price, DOR argues that ARCO's taxes should not be limited either.

The dispute centers around the term "applicable." ARCO argues that since the federal price regulations set a ceiling price for ANS oil, there is an "applicable" ceiling price and the value of the oil cannot exceed that price. DOR takes a more realistic interpretation of "applicable," and looks to see if, in fact, a ceiling price applied and limited ARCO's income. DOR's reading of the regulation is consistent with the language of the regulation and supported by the policy behind the statute. Since the ceiling price did not limit ARCO's income, it seems incorrect to apply a ceiling price to limit taxes on that income.

To read the regulation as ARCO does would also be inconsistent with the policy underlying the Oil and Gas Income Tax statute. As this court noted in *ARCO*, the "primary purpose of the Oil Tax was to rectify a perceived underestimation of oil production and pipeline transportation income." *ARCO*, 705 P.2d at 437. ARCO's interpretation of the regulation would result in undertaxation of income earned from oil production in this state. Therefore this court interprets 15 AAC 12.120 to allow taxation of entitlements benefits received by ARCO.

## III. CONCLUSION

We read the plain language of 15 AAC 21.350 to preclude the use of an apportionment formula by· DOR to calculate allowable interest expense under AS 43.21.030 and therefore AFFIRM the superior court on the TAPS interest issue. We interpret 15 AAC 12.120 to allow taxation of ARCO's entitlements benefits and therefore REVERSE the superior court for further action consistent with this opinion.

RABINOWITZ, Justice, with whom MOORE, Chief Justice, joins, dissenting in part.

I dissent from the majority's holding that 15 AAC 12.120 allows taxation of ANS price controlled crude oil at a sales price greater than the applicable ceiling price of that oil.[1]

The controlling language in the production tax regulation is the following phrase in 15 AAC 12.120(a): "[I]n no event may the value at the point of production for a taxpayer's oil or gas exceed the ceiling price (if any) that is applicable to that oil or gas under a mandatory price control program." The parties do not dispute that there was a mandatory price control program in effect; namely, the federal price ceilings imposed by the Department of Energy (DOE). The DOR itself found as a matter of fact that the DOE ceiling price did apply to ANS crude even where the ANS crude was internally transferred. There is no dispute that in 1977, DOE promulgated a rule which established that ANS price-controlled oil would be treated

---

1. As a preliminary matter, I note that the independent judgment standard of review is applicable, as the entitlement question as it is framed in this appeal involves a question of ꞏstatutory interpretation not involving agency expertise. *See Nat'l Bank of Alaska v. State, Dep't of Revenue,* 642 P.2d 811, 815 (Alaska 1982). Additionally, due to the marked inconsistency between DOR's historical interpretation of production tax valuation and its current position, the appro-

priate weight of the agency's current interpretation is called into question. *See Earth Resources Co. v. State, Dep't of Revenue,* 665 P.2d 960, 965 (Alaska 1983) (noting that the substitution of judgment test is appropriate where the knowledge and experience of the agency is of little guidance to the court). The standard of review, however, is not dispositive on the entitlements question, as DOR's interpretation is unreasonable.

as if it were uncontrolled oil for purposes of the so-called "entitlements program." Consequently, until this rule was changed in July of 1980, no refiner of ANS crude oil was subject to an "entitlement burden" on that oil. Also, there is no question that DOR understood the implications of the DOE entitlements program at the time that it drafted the regulation in question. It is evident that the regulation was crafted to address the proper production tax burden of the integrated producer-refiner, and to include reference to the entitlements system. *See* 15 AAC 12.120(b)(2).

It is undisputed that DOR subsequently interpreted the regulation in a manner which required all producers to report at "full ceiling price," and which assessed all producers' production values at a value no greater than the ceiling price. In two production tax decisions issued during this period, the Department affirmed that ceiling prices were a limitation on value at the point of production. *In the Matter of Mobil Oil Corp.*, Rev.Dec. 83–17, (June 2, 1983); *In the Matter of Getty Oil Co.*, Rev.Dec. 82–57, at 199–200 (Dec. 6, 1982). Also, memoranda produced by the Petroleum Revenue Division during this period indicate that the Division held the view that any value derived by refiners from the entitlements program was not production value.[2]

Despite this history, the state now asks this court first, to read the key language of 15 AAC 12.120(a) as follows: "[I]n no event may the value at the point of production ... exceed the ceiling price (if any) that is applicable...." This interpretation ignores the remainder of the sentence, which continues: "under a mandatory price control program." The state contends that the regulation should be read as committing the applicability of the federal price control ceilings to its discretion, rather than establishing a hard and fast rule. Given that soaring oil prices coupled with the ANS entitlements exclusion led to increased profits for ANS refiners, the state argues,

the ceiling price is not "applicable" to integrated producers, since they can be expected to share in the revenues received by their refinery counterpart. Thus, the so-called "entitlements benefit" of an integrated refiner should be treated as "production value" under 15 AAC 12.120(a).

This interpretation asks us to ignore a cardinal principle of statutory interpretation: Language that is clear and unambiguous in meaning should not be altered to create a new act, or in this instance, a new regulation. The phrase "price that is applicable" clearly and unambiguously refers to the federal price control program, and the sentence cannot logically be severed.

Nonetheless, the state ignores any problems of syntax and claims that its interpretation will vindicate the well-accepted tax principle that form should not triumph over substance. It claims that ARCO is using the "form" of the production tax to evade being taxed on the entitlements benefit, which it characterizes as value that was essentially "liberated" at the wellhead or, in other words, inherent in the oil in its natural state. In this regard, the state misapplies the so-called "substance over form" doctrine in three respects.

First, a fundamental aspect of the substance over form inquiry is whether the taxpayer has structured his transactions to evade tax liability. *See Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935). ARCO's integrated structure existed prior to institution of the entitlements program.

Second, the proper inquiry as to the relationship between substance and form relative to the "value" of the entitlements benefit is this: Did the taxpayer receive something of benefit without incurring any of the obligations normally associated with that benefit? *See, for example, Strick Corp. v. United States*, 714 F.2d 1194, 1206 (3d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984). I

---

**2.** The state responds that the Division's opinions were not binding on DOR or, in the alternative, that the opinions were "mistakes." To the extent that agency expertise is implicated in this issue, however, the views of the Division are relevant to our understanding of the entitlements issue.

conclude that ARCO incurred the obligations normally associated with the benefit of production income because it paid taxes on its production income pursuant to 15 AAC 12.120.

Third, the tension between substance and form is inherent in the taxation of any natural resource. As we noted in *Atlantic Richfield Co. v. State*, 705 P.2d 418, 425 (Alaska 1985): "Before it is transported for sale, oil, like coal, has inherent value, to which profits and income can properly be attributed." The concept of "inherent value," however, is intangible. Any effort to allocate this "value" to different stages in the production and processing of a natural resource through statutory definitions is by its very nature an exercise of form, or artifice.

The mere existence of this tension is not a sufficient reason to strike down a valid regulation. Through the provisions of AS 43.21, our legislature directed DOR to craft a regulatory structure that would recapture some portion of this "value" at various points in the production and processing of the crude oil resource. In other words, the legislature directed DOR to provide its best estimate of the way in which the "form" of the tax structure should approximate the "substance" of the inherent value. DOR performed this task through 15 AAC 12.120. The language of this regulation is clear. We can not now, under the slogan of "substance over form," champion a new standard, absent ambiguity in the existing regulation.

**3.** ARCO raised several other arguments before the superior court. While these arguments were not reached by the superior court in its ruling, they may provide grounds for affirmance of that ruling. *See State v. Bering Strait Regional Educ. Attendance Area*, 658 P.2d 784, 786 (Alaska 1983) (issues raised before lower court, though not reached in its ruling, may be relied upon on appeal to affirm the ruling in question). ARCO's arguments before the superior court included the following: That to tax the revenue at issue results in double taxation, since the entitlements benefits were taxed by the state as apportionable income under AS 43.21.040; that such taxation denies ARCO due process of law; that the state's arguments in this case contradict its position before us in *Atlantic Rich-*

If the issue is considered from the point of view of refiners, it is clear that all refiners of ANS crude oil were benefitted by the lack of an entitlements burden during the period in question. This benefit, like the benefits from the price controls, resulted in additional profits for ANS refiners. ARCO's refinery profits are no more or less real than the profits of a nonintegrated refiner who refined ANS crude.

For the foregoing reasons I reject the state's contentions that refinery profits of some, but not all, of these refiners of ANS crude oil now may be taxed as production income, despite the clear language of the applicable regulation.[3]

*field Co. v. State*, 705 P.2d 418 (Alaska 1985), where the state argued that AS 43.21.020 excluded from gross production revenue all income from "downstream" activities; that DOR's interpretation violates the commerce clause, as it discriminates against out-of-state companies; that DOR's interpretation deprives ARCO of equal protection by treating some producers differently from others; that DOR's attempt to tax ANS at decontrolled values violates the supremacy clause by manipulating oil revenues in contradiction of the federal price control program; and that the hearing process did not provide ARCO with due process of law. Given my view that the regulatory language is dispositive, I find it unnecessary to address the merits of any of these claims.