STATE of Alaska, DEPARTMENT OF REVENUE, Appellant,

v.

DYNCORP AND SUBSIDIARIES, Appellee.

No. S–9221.

Supreme Court of Alaska.

Dec. 22, 2000.

**21.** *See id.* at 239.

**22.** *See id.*

Stephen C. Slotnick, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

David C. Crosby, Wickwire, Greene, Crosby, Brewer & Seward, Juneau, and Kenneth H. Silverberg, Nixon, Peabody, LLP, Washington, DC, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

1. *See* AS 43.20.021; AS 43.20.030.

## OPINION

BRYNER, Justice.

### I. *INTRODUCTION*

The Office of Tax Appeals abated a late-filing penalty imposed against DynCorp by the Department of Revenue (the department), finding reasonable cause for DynCorp's failure to give the department timely notice of changes to its federal tax returns. The department appeals, arguing that the Office of Tax Appeals erred in failing to defer to the department's decision assessing the penalty and that it misapplied the reasonable-cause exception. We conclude that the Office of Tax Appeals properly applied de novo review and therefore owed no special deference to the department. But because the facts do not support a finding of reasonable cause under the correct legal standard, we reverse the Office of Tax Appeals' decision abating the penalty.

### II. *FACTS AND PROCEEDINGS*

DynCorp is a multinational corporation with forty-nine domestic subsidiaries and several foreign partnerships. It is based in Virginia and does business in almost every state. The corporation does over one billion dollars worth of business each year. In 1995 DynCorp and its subsidiaries filed almost 300 state tax returns. DynCorp pays Alaska taxes under AS 43.20.

A corporation's Alaska tax return is based in part on its federal return.[1] When an Internal Revenue Service (IRS) audit requires changes to a corporation's federal return, AS 43.20.030(d) requires that the corporation notify the state and pay any additional state taxes within sixty days.

The IRS audited DynCorp's tax returns for 1983 through 1987. Following its audit, the IRS adjusted DynCorp's federal tax returns for these years and directed it to pay additional taxes. DynCorp first received notice of the amount of the federal adjustments on July 8, 1994, and the IRS issued its formal assessment on April 3, 1995. DynCorp paid the federal taxes shortly after receiving this assessment.

In addition to assessing a tax liability for several years, the IRS found that DynCorp was entitled to a substantial refund for one of the years in question. Under the Internal Revenue Code, the IRS must refer its refund determination to a congressional joint committee for review and approval before the decision can be made final.[2] The joint committee approved the IRS's recommendation and the IRS issued a final decision on December 7, 1995.

DynCorp acknowledges that under AS 43.20.030(d), it was required to provide notice of the IRS assessment to the Department of Revenue by February 7, 1996, sixty days after the IRS issued its final decision. The department did not receive DynCorp's amended returns until June 24, 1996.

Upon receiving DynCorp's late notice, the department assessed a fifteen percent penalty on the late-filed returns for tax years 1983 through 1987. DynCorp protested the penalty and requested an informal conference. During that proceeding, the department confirmed the penalty and adjusted it upwards to the twenty-five percent maximum. The total penalty amounted to $5,506.

DynCorp appealed to the Office of Tax Appeals. An administrative law judge from that office conducted an evidentiary hearing in which DynCorp attempted to show that its failure to pay the additional taxes on time was due to a reasonable cause and not willful neglect.

The facts presented at the hearing were undisputed. Upon receiving the IRS's final assessment in December 1995, DynCorp determined that it was obligated to file over 300 amended state returns. DynCorp only had four employees assigned to work on these returns. Because the staff was not sufficient to do the job, DynCorp hired Peat Marwick, LLC, an accounting firm, to assist. In order to keep costs down, however, Peat Marwick was instructed not to complete any returns, but only to prepare spreadsheets, or workpapers, which DynCorp would then use to prepare the amended returns.

DynCorp's work was slowed because the supervisor DynCorp assigned to the project, John Ireland, personally reviewed each amended return before it went out. Ireland testified that nobody else in the corporation could have assisted him with these reviews, because "you have to have institutional knowledge of what's happened, and you know, I was the person that had to really do this." Although Ireland needed to review each of the amended returns personally, he spent time on other projects, including supervising an ambitious fifty-year earnings and profit study and preparing SEC filings. At the start of the project, Ireland instructed his staff to give priority to filing amended returns in those states where DynCorp would obtain a refund. Ireland also decided that his staff and Peat Marwick should complete the more complicated returns last, including the return required by Alaska.

Ireland knew of Alaska's sixty-day deadline. He knew that DynCorp was not going to file its Alaska return on time, but he did not ask Alaska to extend the deadline because he did not realize that DynCorp would be subject to a penalty for a late filing.

After hearing this evidence, the administrative law judge issued an opinion reversing the department and abating DynCorp's penalty, finding that DynCorp had reasonable cause to file a late return. The department moved for reconsideration. Following a second evidentiary hearing, the administrative law judge issued a final decision confirming the earlier opinion. The judge found that the sheer number of returns that DynCorp had to file, combined with the short filing period, amounted to extraordinary circumstances and that DynCorp had sound business reasons for preparing other state returns before completing Alaska's.

The department appealed to the superior court, which affirmed the tax court's decision. The department appeals.

## III.  DISCUSSION

### A.  Standard of Review

#### 1.  Standard of review for Office of Tax Appeals' review of department's decision

As a preliminary matter, the department asks this court to determine what level

**2.**  See 26 U.S.C. § 6405(a) (1994).

of deference the Office of Tax Appeals must give to the department's decisions. The department contends that the Office of Tax Appeals "must uphold the Department's decision on imposition of a penalty unless the decision is not supported by a reasonable basis." According to the department, the administrative law judge should have deferred to the decision the department reached in its informal conference with DynCorp. Instead, the judge "[made] findings of fact based on a preponderance of the evidence and exercise[d] her own independent judgment in reaching a conclusion as to whether the circumstances surrounding the late filing or payment constitute reasonable cause."

Before the legislature created the Office of Tax Appeals in 1996, disputes between taxpayers and the department were adjudicated at the administrative level by the Commissioner of Revenue.[3] In creating the Office of Tax Appeals, the legislature removed the department's adjudicatory role, creating a new "quasi-judicial agency" charged with the duty of resolving tax disputes.[4] In AS 43.05.435, the statute creating the Office of Tax Appeals, the legislature wrote:

> The administrative law judge shall hear all questions de novo under AS 43.05.400–43.05.499. The administrative law judge shall
>
> (1) resolve a question of fact by a preponderance of the evidence or, if a different standard of proof has been set by law

for a particular question, by that standard of proof;

> (2) resolve a question of law in the exercise of the independent judgment of the administrative law judge;
>
> (3) defer to the Department of Revenue as to a matter for which discretion is legally vested in the Department of Revenue, unless not supported by a reasonable basis.[5]

By describing the Office of Tax Appeals as a "quasi-judicial agency," and adopting the standards of review provided in AS 43.05.435, the legislature created the functional equivalent of a full trial court charged with the task of impartially resolving tax disputes. Accordingly, the Office of Tax Appeals, like any trial court, must review and determine facts de novo,[6] and exercise its independent judgment in interpreting and applying the law to the facts.[7] And, like the superior court, the Office of Tax Appeals shall defer to agency decisions only where a question of law involves particularized agency expertise or where the agency's specialized knowledge and experience would be especially probative as to the meaning of a statute or regulation.[8]

This case involves the application of the department's regulation defining reasonable cause for missing a tax deadline.[9] That regulation incorporates by reference the body of federal law interpreting the Internal Revenue Code's reasonable-cause exception.[10] Because the outcome of this case rests solely on the application of established federal law to undisputed facts, it cannot be

**3.** *See* former AS 43.05.240.

**4.** *See* preamble, ch. 108, SLA 1996; AS 43.05.405, AS 43.05.435.

**5.** AS 43.05.435.

**6.** *See* AS 43.05.435(1); *see generally Williams v. Wainscott*, 974 P.2d 975 (Alaska 1999) (discussing trial court's role in conducting de novo factual hearing).

**7.** *See* AS 43.05.435(2).

**8.** *See* AS 43.05.435(3); *State, Dep't of Revenue v. Atlantic Richfield Co.*, 858 P.2d 307, 308 (Alaska 1993).

**9.** *See* 15 Alaska Administrative Code (AAC) 05.200 (1999).

**10.** *See* 15 AAC 05.200(b).

> A taxpayer who wishes to avoid the penalty established by AS 43.05.220 for failure to file a tax return or pay a tax must make an affirmative showing of all facts alleged as a reasonable cause for his or her failure to file the return or pay the tax on time in a written statement containing a declaration that it is made under penalty of perjury. The statement should be filed with the return or filed with the Department of Revenue as soon as possible thereafter. In determining whether the delinquency was due to reasonable cause and not to willful neglect, the department will apply the administrative and judicial interpretations of Internal Revenue Code Sec. 6651 and the Treasury Regulation Sec. 301.6651–1(c).

said that "the answer depends on the particularized experience or knowledge of the administrative personnel." [11] Therefore, acting as the functional equivalent of a court of original jurisdiction, the Office of Tax Appeals correctly concluded that it owed no special deference to the decision reached by the department.

### 2. Standard of review for appellate review of Office of Tax Appeals and superior court decisions

██ In reviewing the Office of Tax Appeals' decision, we apply the "substantial evidence" test to questions of fact, and the "substitution of judgment" test for questions of law.[12] Finally, when the superior court acts as an intermediate court of appeal, we give no deference to the superior court's decision; instead, we independently review the merits of the administrative determination.[13]

### B. Did DynCorp Show Reasonable Cause for Late Filing?

██ The department argues that the Office of Tax Appeals erred by reversing the department's finding that no reasonable cause existed for DynCorp's failure to give the department timely notice of changes to its federal tax returns.

Under AS 43.20.030(d), a taxpayer must notify the Department of Revenue of any alteration of the taxpayer's federal income tax return and pay any additional taxes within sixty days.[14] A late-filing taxpayer is subject to a five percent penalty for each thirty-day period during which the taxpayer fails to file, up to a maximum penalty of twenty-five percent.[15] A taxpayer can avoid this penalty by showing "that the failure is due to a reasonable cause and not to wilful neglect." [16]

The department has adopted a regulation defining "reasonable cause," which references the administrative and judicial interpretations of the federal Internal Revenue Code and Treasury Regulations: "In determining whether the delinquency was due to reasonable cause and not to willful neglect, the department will apply the administrative and judicial interpretations of Internal Revenue Code Sec. 6651 and the Treasury Regulation Sec. 301.6651 1(c)." [17] Thus, because the reasonable-cause exception in AS 43.05.220(a) mirrors the Internal Revenue Code's reasonable-cause exception, and because the department's regulation defining that exception explicitly adopts the body of federal law interpreting the Internal Reve-

11. *Gulf Oil Corp. v. State, Dep't of Revenue,* 755 P.2d 372, 378 n. 19 (Alaska 1988) (internal quotation omitted).

12. *See Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

13. *See id.* (citation omitted).

14. AS 43.20.030(d) provides:

A taxpayer, upon request by the department, shall furnish to the department a true and correct copy of the tax return which the taxpayer has filed with the United States Internal Revenue Service. Every taxpayer shall notify the department in writing of any alteration in, or modification of, the taxpayer's federal income tax return and of a recomputation of tax or determination of deficiency, whether with or without assessment. A full statement of the facts must accompany this notice. The notice shall be filed within 60 days after the final determination of the modification, recomputation or deficiency, and the taxpayer shall pay the additional tax or penalty under this chapter. For purposes of this section, a final determination shall mean the time that an amended federal return is filed or a notice of deficiency or an assessment is mailed to the taxpayer by the Internal Revenue Service, except that in no event will there be a final determination for purposes of this section until the taxpayer has exhausted rights of appeal under federal law.

15. AS 43.05.220(a) provides:

Five percent shall be added to a tax for each 30 day period or fraction of the period during which the taxpayer fails to file at the time or times required by law or regulation a return or report, or pay the full amount of the tax, or a portion or a deficiency of the tax, as finally determined by the department and required by this title, unless it is shown that the failure is due to a reasonable cause and not to wilful neglect. The penalty may not exceed 25 percent in the aggregate. The penalty is computed only on the unpaid balance of the tax liability as determined by the department. The department shall prescribe by regulation circumstances which constitute reasonable cause for purposes of this section.

16. *Id.*

17. 15 AAC 05.200(b).

nue Code's exception and its related treasury regulation, we rely heavily on the decisions of the federal courts in resolving the question before us.

The Supreme Court discussed the reasonable-cause exception in *United States v. Boyle*,[18] noting that the term "reasonable cause" requires "the taxpayer to demonstrate that he exercised 'ordinary business care and prudence' but nevertheless was 'unable to file the return within the prescribed time.'"[19] The Court also noted that the IRS regulations exempt taxpayers from the penalty "when the tardiness results from postal delays, illness, and other factors largely beyond the taxpayer's control. The principle underlying the IRS regulations and practices [is] that a taxpayer should not be penalized for circumstances beyond his control...."[20]

In *In re Craddock*,[21] the Tenth Circuit considered a case similar to DynCorp's, where the taxpayer argued that being "too busy" could constitute reasonable cause for late filing. Craddock owned a real estate development firm and his accounting department prepared the company's tax returns.[22] The firm experienced exponential growth, and Craddock hired additional accountants to keep up with the increased workload, building the accounting staff from five in the early 1980s to fifty by 1985.[23] Craddock also hired an outside accounting firm to review the returns prepared by his accounting department.[24] Through the relevant years, Craddock spent about fifty percent of his total payroll (approximately $1 million) on accounting and tax staff, and an additional $100,000 per year in fees to the outside accounting firm.[25] Craddock also purchased a new accounting system to help manage his growing business.[26] Despite all these efforts,

he knew that his tax returns were not being timely filed, but did not instruct his staff to file them on time, because he wanted them to be accurate.[27] He also did not hire an outside firm to complete the returns, because "they were too expensive."[28]

The court ruled that, although Craddock had exercised some care in increasing his accounting staff, having outside firms review the tax returns, and replacing his antiquated computer system, he had "failed to exercise 'ordinary business care and prudence' in ensuring his returns were timely filed and failed to show that he was 'unable' to file the returns on time."[29] The court wrote:

> Mr. Craddock's reasons for his failure to timely file, such as his records or information could not be assimilated fast enough, his accounting staff was overworked, and his computer system was inefficient, are not reasonable cause. A taxpayer is "expected in the exercise of ordinary business care and prudence ... not [to] take on such a load that he could not fulfill his own legal obligations within the required time." *Dustin v. Commissioner*, 467 F.2d 47, 50 (9th Cir.1972) (internal quotation marks omitted); *Oliver v. Commissioner*, 73 T.C.M. (CCH) 2035, 2051, 1997 WL 66769 (1997) ("[A] taxpayer is not excused from timely filing his income tax return merely because he is overworked."); *Merriam v. Commissioner*, 70 T.C.M. (CCH) 627, 1995 WL 522813 (1995) ("[A] heavy workload and preoccupation with business affairs do not constitute reasonable cause for the untimely filing of a tax return."), *aff'd*, 107 F.3d 877 (9th Cir.1997) (table opinion).... The complexity of one's affairs also does not give reasonable cause. *Edgar v. Com-*

---

**18.** 469 U.S. 241, 245, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985).

**19.** *Id.* at 246, 105 S.Ct. 687 (quoting 26 C.F.R. § 301.6651(c)(1) (1984)); *see* 26 C.F.R. § 301.665–1(c)(1) (2000).

**20.** *Boyle*, 469 U.S. at 248 n. 6, 105 S.Ct. 687 (citation omitted).

**21.** 149 F.3d 1249 (10th Cir.1998).

**22.** *See id.* at 1252.

**23.** *See id.*

**24.** *See id.*

**25.** *See id.*

**26.** *See id.*

**27.** *See id.* at 1253.

**28.** *Id.*

**29.** *Id.* at 1255.

*missioner,* 56 T.C. 717, 762–63, 1971 WL 2464 (1971).[30]

Considering that Craddock was a sole proprietor, the efforts that he undertook to avoid late filing stand in sharp contrast to the steps taken by DynCorp—a billion-dollar-a-year multinational corporation—to achieve the same result. Craddock hired fifty employees to work on his tax returns, while DynCorp employed a staff of four. While Craddock paid an outside firm more than $100,000 to review his staff's work, DynCorp paid approximately $51,000 for Peat Marwick's work. If Craddock could not escape the penalty for late filing, there is little basis for accepting DynCorp's claim that it should not have to pay.

Moreover, *Craddock,* like *Boyle* and other federal cases applying *Boyle,* emphasized a second aspect of the reasonable-cause requirement: that in order to demonstrate reasonable cause for a late filing, the taxpayer must be able to show that the circumstances surrounding the late filing were beyond the taxpayer's control.[31] In *Craddock,* the court deferred to the bankruptcy court's finding that the circumstances surrounding the taxpayer's late filing were within "his ability to control," and therefore he could not "prove that he was *unable* to file the tax returns on time." [32]

As in *Craddock,* the circumstances surrounding DynCorp's late filing were within the company's ability to control. The record shows that DynCorp chose to file amended returns first in states where DynCorp was entitled to a refund and to file unitary returns, like the Alaska return, last. DynCorp was aware of Alaska's sixty-day deadline, but decided to put the Alaska return low on its list of priorities. Moreover, despite DynCorp's reliance on an internal structure that required Ireland to review each of the amended returns, Ireland spent time on other projects instead of devoting his full time to supervising the amended returns. Thus, the company made choices to use the resources that it did have in a manner that prevented timely filing. These facts all indicate that DynCorp's late filing, like Craddock's, was within its ability to control. Because the company's delay in filing resulted from the manner in which it elected to allocate its resources, DynCorp's claim of reasonable cause is unavailing.

DynCorp argues that *Craddock* is distinguishable because that case involved Craddock's ongoing knowledge that his annual tax returns were not being filed on time. In contrast, DynCorp argues, here the "IRS forced a massive, one-time adjustment to DynCorp's numerous state tax returns." DynCorp insists that it could not have foreseen that its normal tax staff would not be up to the job of completing the amended returns.

The Office of Tax Appeals adopted this position, finding that this case was distinguishable from cases involving "original tax returns that were filed long after the date set by statute for filing annual returns." The Office of Tax Appeals deemed it significant that, instead of missing a fixed statutory deadline, like April 15, DynCorp missed a " 'floating' sixty day period for taxpayers to file a notice of adjustment of tax liability." Thus, the Office of Tax Appeals found that "DynCorp had no control over, or advance

30. *Id.*

31. *See United States v. Boyle,* 469 U.S. 241, 248 n. 6, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (noting that the principle underlying the reasonable-cause exception is "that a taxpayer should not be penalized for circumstances beyond his control"); *Valen Mfg. Co. v. United States,* 90 F.3d 1190, 1193 (6th Cir.1996); *Conklin Bros. of Santa Rosa, Inc. v. United States,* 986 F.2d 315, 318–19 (9th Cir.1993) (holding that corporate taxpayers were not disabled from meeting tax filing deadline even though corporate employees responsible for such filings secretly missed deadlines without management's knowledge, despite corporation's prudence and care in supervising

its employees, the situation was ultimately within its control, and thus did not constitute reasonable cause); *In re Hudson Oil Co., Inc.,* 91 B.R. 932, 950 (Bankr.D.Kan.1988) (finding reasonable cause because it was "physically impossible" for the newly-appointed trustee to complete a return within three weeks); *Tabbi v. Commissioner,* 70 T.C.M. (CCH) 836, 838, 850 (1995) (finding reasonable cause where the taxpayers' son was terminally ill and the taxpayers spent four continuous months in the hospital around the time their tax return was due).

32. *Craddock,* 149 F.3d at 1255–56.

notice of, the date that the IRS would issue its final determination."

The Office of Tax Appeals found this case analogous to *In re Hudson Oil Co.*[33] There, a bankruptcy trustee was appointed over the taxpayer's estate three weeks before the taxpayer's federal tax return was due. The bankruptcy court found that the trustee had reasonable cause for late filing. A controlling factor was that the circumstances surrounding the late filing were beyond the trustee's control.[34] The trustee was given three weeks to prepare a tax return, using books that were "in disarray." [35] The court found that "it was physically impossible for the trustee to have prepared the ... return within that three week period." [36]

But the record in this case belies the conclusion that DynCorp lacked advance notice of the IRS assessment. The IRS first notified DynCorp of the amount of its federal adjustments on July 8, 1994. The IRS issued DynCorp a second copy of its report in February 1995, and issued its final assessment on April 3, 1995. Because a refund was involved, the assessment was referred to a congressional joint committee for review. The committee approved the assessment without exception and issued a final decision on December 7, 1995. DynCorp thus knew for well over one year that it would have to file amended state tax returns. It also knew the probable amount of the impending adjustments eight months before the IRS's final determination. The only thing DynCorp did not know in advance was the exact time when Congress would stamp final approval on an IRS action where eventual approval could be predicted with reasonable certainty. Furthermore, the record reveals that DynCorp was penalized in 1992 when it failed to notify Alaska within sixty days of an IRS assessment, so it was on notice of the consequences of failing to comply with AS 43.20.030(d). Given these circumstances,

surprise simply was not an element of this case.

And in contrast to *Hudson*, the record here provides no support for the proposition that "it would have been physically impossible" for DynCorp to have anticipated, planned for, and met the demands that it faced as a result of the IRS assessment. In *Hudson*, a company's books were thrust on the trustee with no advance notice; and through no fault of the trustee, those books were in disarray. Here, on the other hand, DynCorp knew well in advance of congressional action that adjustments to its state returns would likely be necessary; and the company's late filing reflects its deliberate decision to keep its costs low and to prioritize its filing of amended returns to collect refunds first. This is not a case where the taxpayer was *unable* to meet Alaska's deadline, but rather is one where the taxpayer chose a course that predictably prevented it from filing on time.

DynCorp nevertheless refers to the workload resulting from the IRS's assessment as the "proverbial '100-year flood.'" But the record hardly supports this assertion. DynCorp is a billion-dollar-a-year corporation, doing business in nearly every state and several foreign nations. The record shows that DynCorp was the subject of similar IRS assessments in the audit cycles preceding and following the one involved in this case. In a typical year, DynCorp files close to 300 state tax returns. Thus, the number of amended returns that DynCorp was required to prepare was not in itself unusual. In any event, the federal courts have consistently held that exercising "ordinary business care and prudence" requires the taxpayer to anticipate the magnitude and complexity of his tax obligations, and to plan accordingly.[37] For this reason, the size and complexity of the taxpayer's returns cannot establish rea-

---

**33.** 91 B.R. 932 (Bankr.D.Kan.1988).

**34.** *See id.* at 950–51.

**35.** *Id.* at 950.

**36.** *Id.*

**37.** *See Dustin v. Commissioner,* 467 F.2d 47, 50 (9th Cir.1972) (holding that the taxpayer "could have been expected in the exercise of 'ordinary business care and prudence ... not [to] take on such a load that he could not fulfill his own legal obligations within the required time'"); *see also Craddock,* 149 F.3d at 1255.

sonable cause for late filing.[38] Thus, even if the IRS assessment created an unusual amount of work for DynCorp, the applicable case law would recognize no ground for finding reasonable cause for late filing.

Instead of questioning whether DynCorp had exercised "ordinary business care and prudence" in anticipating the size and complexity of its tax obligations, the Office of Tax Appeals applied a "good business judgment" test. The administrative law judge wrote

> DynCorp had sound business reasons for deciding to give first priority to preparing the amended returns in states where refunds were due and to place a lower priority on making the adjustments to more complicated unitary returns, like those of New York and Alaska. Mr. Hevey, a Peat Marwick partner with 30 years of professional experience in tax matters, testified that in his opinion DynCorp acted responsibly under the circumstances. I agree.

Thus, the Office of Tax Appeals turned what should have been an inquiry into whether DynCorp exercised ordinary business care and prudence in ensuring timely compliance with Alaska's sixty-day deadline into an analysis of whether it made good business sense for DynCorp to deliberately choose not to comply with the deadline.

DynCorp's actions might have been prudent business decisions in the narrow sense of being advantageous from the standpoint of the company's financial interests. But for purposes of the reasonable-cause exception, that is beside the point. From a business perspective, it always makes sense to make money. Were we to equate this kind of business prudence, or "good business sense," with the reasonable-cause exception's requirement of ordinary business care, then businesses would always have reasonable cause to avoid paying taxes on time.

Federal case law—which the department's regulation expressly adopts as Alaska's measure—confirms this point. By requiring circumstances beyond a company's control and proof that the company is actually unable to comply, these cases firmly establish that the exception for reasonable cause is not meant to spare the company from the disadvantageous legal consequences of its own financially advantageous decisions. Instead, the exception protects only against events that prove unavoidable despite the exercise of ordinary business care to avoid them and that unavoidably prevent a timely filing, once they occur.[39] Absent such circumstances, a claim of "too busy" does not establish reasonable cause, because the size of the taxpayer's workload is within the control of the taxpayer, and thus the taxpayer cannot show an *inability* to meet the tax deadline.[40]

"[O]ur system of self-assessment ... of a tax simply cannot work on any basis other than one of strict filing standards. Any less rigid standard would risk encouraging a lax attitude toward filing dates." [41] " 'If every taxpayer who ... was too busy to file a return escaped the penalty for failure to file, our tax system would soon collapse.' "[42]

## IV. *CONCLUSION*

The Office of Tax Appeals erred in finding that DynCorp had reasonable cause for notifying the Department of Revenue of changes to its federal tax returns more than sixty days after the IRS's action. Because being "too busy" is not reasonable cause for late filing, DynCorp cannot avoid the penalty. Therefore, we REVERSE.

**38.** *See Oliver v. Commissioner,* 73 T.C.M. (CCH) 2035, 2051 (1997); *Merriam v. Commissioner,* 70 T.C.M. (CCH) 627, 635–36 (1995), *aff'd,* 107 F.3d 877, 1997 WL 103439 (9th Cir.1997); *Edgar v. Commissioner,* 56 T.C. 717, 762–63, 1971 WL 2464 (1971).

**39.** *See Craddock,* 149 F.3d at 1255–56.

**40.** *See id.*

**41.** *United States v. Boyle,* 469 U.S. 241, 249, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (footnote omitted).

**42.** *Craddock,* 149 F.3d at. 1257 (quoting *Logan Lumber Co. v. Commissioner,* 365 F.2d 846, 854 (5th Cir.1966)).